### THE HIGHCLIFF.

### MACLEAN v. UNDERCLIFF TERMINAL & WAREHOUSE CO.

(District Court, S. D. New York. December 20, 1922.)

Shipping ☜53—Owner of cargo held responsible for improper loading on lighter.

Respondent, which loaded a lighter with steel and iron goods at its warehouse for libelant, *held* not liable for damage to the cargo, caused by improper loading, on evidence that the loading was done as required by libelant's manager; libelant being owner of the lighter pro hac vice, under a harbor demise from the respondent.

In Admiralty. Suit by William Maclean, Jr., against the Undercliff Terminal & Warehouse Company, owner of the lighter Highcliff. Decree for respondent.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for libelant.

Bigham, Englar & Jones, of New York City (T. Catesby Jones, of New York City, of counsel), for respondent.

WARD, Circuit Judge. The libelant, Maclean, on his own behalf as well as on behalf of his insurers, brought this suit against the respondent. He was the owner of steel and iron goods in the respondent's warehouse and in care at its terminal. For the purpose of relieving the congestion of cars and of reducing charges for demurrage, he chartered the lighter Highcliff from the respondent. Whether the charter was the usual harbor charter of demise is not perfectly clear. The libel is vague on the subject, but the answer treats it as a demise. There was evidently a telephone conversation between libelant and Morton, the general superintendent of the respondent, on the subject, Thursday, July 18th. On that day Maclean wrote a letter to the respondent, stating his understanding. On the 19th Morton, evidently before receiving this letter, wrote to the libelant, stating his understanding. Morton

was general superintendent of the respondent and also transportation manager of the Warner Sugar Refining Company, in whose name he signed the letter. But there seems to be no dispute between the parties as to the fact that the Undercliff Company was owner pro hac vice. The fact that the libelant stated in his letter that he was to pay for towage to the steamer, while Morton stipulated that the libelant was to pay for insurance and all necessary expenses, such as night watching for the captain while the boat was under "its control," convinces me that the charter was a demise of the boat, and Morton testifies that such was his understanding. Monk v. Cornell Steamboat Co., 198 Fed. 472, 117 C. C. A. 232.

The lighter was originally one-half of a car float; the round end being the bow, and the square bulkhead, at the point where the car float was cut in two, being the stern. It was about 100 feet long, and, like all car floats, of solid construction. Its stern was against the respondent's bulkhead at Edgewater, N. J.; the bow projecting out into deeper water. It is admitted on both sides that the cargo laden on the lighter was damaged as the result of improper loading in this respect, viz.: That instead of its being distributed first at the middle and then at both ends, as it should have been, it was laden first on the bow and then gradually aft, until about a third of the lighter was covered. When the tide fell, the bow rested on the bottom, which was mud, and the rising tide, coming over the deck and through two booby hatches, open for ventilation, one at each side of the bow, filled the lighter, which sustained no serious damage.

The first defense is that the lighter was unseaworthy. I find to the contrary. She had been very completely overhauled at an expense of about $4,500 some three months before the accident, and had been continuously employed in transporting such valuable cargoes as sugar without damage. She did not need and did not get any repairs after the accident, and the libelant used her for storage for six months thereafter.

The material question is: Who is to blame for the improper loading? There is no doubt that it was done under the supervision of the respondent's servants, and that the respondent was paid for the labor. Its defense is that the cargo was laden in accordance with the express instructions of one McCarthy, libelant's traffic manager, and against the judgment of its general foreman, Skelly, expressed to him at the time. Skelly testifies that McCarthy gave him what seems a satisfactory explanation why he wanted the lighter to be loaded in this way. She was to carry these goods to the steamer City of Lahore, and, the consignments being to various Indian ports, McCarthy wanted to keep them separate. Therefore he insisted that the consignments should be laden beginning at the bow and then going aft, and so kept separate, and his orders had to be obeyed; his principal, Maclean, being owner pro hac vice.

McCarthy not only denies that he ever gave any instructions, but says he was not present at Edgewater at any time during the loading of the lighter; that he went to Washington, D. C., July 18th, and stayed there until 3 p. m. Saturday afternoon, July 20th, returning to New

York about 7 to 8. This would make it impossible for him to have been at Edgewater at any time on Saturday prior, to 7 or 8 p. m. On the other hand, Skelly says the loading began on Saturday morning, July 20th; that McCarthy came to Edgewater about 9 a. m. of that day; that he had a talk with him as to the method of loading; that McCarthy left about 3 to 3:30 p. m.; that he himself superintended the loading until 5 p. m., when he left, giving instructions to Corcoran, foreman of the Undercliff Company, who continued loading the wire and iron pipe until 6 p. m., when he passed on the instructions to Shea, who began loading at 6 p. m. and finished at 11 p. m. Saturday, July 20th. Skelly, Corcoran, and Shea say that McCarthy was at Edgewater on Saturday.

John Stapwasser, respondent's night watchman, says that he discovered the boat was sinking on Sunday at 2 a. m. and went aboard and waked up the captain. It is true that on cross-examination Skelly said several times that the loading began Friday p. m., but I think that he was confusing the days of the week and the days of the month. He said originally the loading began on Saturday p. m. The evidence is clear that it began in the afternoon of some day, was continued until 11 p. m., and the lighter sank at 2 a. m. of the following day. We have the foremen in succession who superintended the loading, Skelly to 5 p. m., Corcoran to 6 p. m., and Shea to 11 p. m. of the first day. The libel itself alleges that the lighter was placed for loading Saturday, July 20th. If the loading began Friday afternoon, it was completed at 11 p. m. of that day, and the lighter sank on Saturday morning at 2 a. m.; but the evidence is quite conclusive that she sank Sunday morning at 2 o'clock.

At the conclusion of the trial the libelant was given the privilege of taking depositions of witnesses at Washington, D. C., and the respondent the privilege of examining one other witness. The respondent examined Sheehan, captain of a boat lying next the Highcliff, who says that McCarthy was at Edgewater on Saturday, and he remembers the fact because McCarthy paid him $1.50 about noon, and when he awoke the next morning he found the bow of the Highcliff submerged.

The witnesses examined by the libelant showed conclusively that McCarthy arrived in Washington on the morning of Thursday, July 18th, went to the Capitol Park Hotel, and left for New York on the night of July 19th, so that he could have been at Edgewater on Saturday morning; whereas, at the trial, he testified that he remained in Washington until Saturday afternoon. My conclusion is that the loading began Saturday afternoon, July 20th, and was finished at 11 p. m.; that McCarthy was present at Edgewater on that day; that he prescribed the method of loading pursued; that, although it caused the damage to the cargo, the respondent is not liable, because it loaded in accordance with McCarthy's orders.

The libel is dismissed, with costs.