## THE OTHO.

**HUILEVER, S. A. DIVISION HUILERIES DU CONGO BELGE et al. v. THE OTHO et al., and four other cases.**

District Court, S. D. New York.

Jan. 26, 1943.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Eugene P. McCue, both of New York City, of counsel), for libelants.

Maclay, Lyeth & Williams, of New York City (J. M. Richardson Lyeth, Mark W. Maclay, and Robert L. Fay, all of New York City, of counsel), for libelant J. H. Rossbach & Bros. Import Corporation and another.

Hunt, Hill & Betts, of New York City (John W. Crandall, George Whitefield Betts, Jr., and Helen F. Tuohy, all of New York City, of counsel), for claimant and respondents.

HULBERT, District Judge.

These are five suits in admiralty against the S/S Otho, in rem, and her owner, in personam, for cargo damages, tried together. They will be disposed of in one opinion.

The Otho, a combination cargo, mail and passenger vessel of 4,839 gross and 2,976 net tons, overall length of 396 feet and a beam of 53 ft. 2 ins., was built in Tacoma, Washington, in 1920, under the supervision of the American Bureau of Shipping.

The vessel is a three-island well-deck ship, with a lower deck, and is constructed on the Isherwood system; that is, the primary shell frame runs in a fore and aft direction in contra-distinction to the transverse system, in which the primary frame and members run in a vertical direction, with any necessary secondary members distributed longitudinally.

Isherwood construction was in use prior to World War No. 1, but it appears not to have been much employed in this country until the Emergency Fleet Corporation adopted that design about 1917. Plate fractures began to develop in this type of ship, roughly, about 5 years ago.

However, the system is still quite universally used for tankers but in dry cargo ships, the frame above the tank tops has been discarded, with some exceptions.

The Otho sailed from New York on Oct. 31, 1940, for West African ports and, upon her return voyage, arrived at New York January 17, 1941, with her No. 1 hold flooded. It appears that most, if not all, of this water entered through a crack 3 ft. 7½ ins. long in the No. 3 starboard hull plate in the H-strake about 18 or 20 feet abaft of the collision bulkhead and at about the 16 foot draft mark, some 7 feet below the water line.

There was also water, as well as sweat damage, claimed to the cargo in the No. 2 hold and 'tween decks and in the bridge deck under the midship housing.

The claimant and respondents plead certain terms of the bill of lading and the Carriage of Goods by Sea Act (46 U.S.C.A.) of which Section 1304 provides, as follows: "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from * * * (c) Perils, dangers, and accidents of the sea or other navigable waters".

It is contended that the injuries to the vessel and damage to cargo were due to perils of the sea. A somewhat similar experience befell a sister ship a year earlier (January, 1940). The claimant and respondents were successful in their defense in that case, which is now on appeal. See The Zarembo, D.C., 44 F.Supp. 915.

The proof in this case is that on the voyage in question, the Otho encountered two storms, or one storm in which there was a lull, and that between Jan. 11th and 14th, the storm attained "catastrophic severity."

Leaving Freetown, Sierra Leone, Africa, December 27, 1940, in very good weather, the log books show the first pumping of the No. 1 hold *starboard* bilge on Dec. 31st, 1940. On Jan. 1st (12 to 4 p. m. watch) it was pumped for 2½ hours. It was also pumped on the morning and afternoon watches Jan. 2nd and 3rd. On *Jan. 4th*, *water appeared* in the No. 1 hold *port* bilge; and both bilges were pumped on the *afternoon* watch of that day; also on Jan. 5th, 6th and 7th. On Jan. 8th, 9th and 10th, the port and starboard bilges were pumped *morning and afternoon*. On Jan. 11th the pumps were on both bilges for 3 hours during the 8 A. M. to 12 noon watch and the whole of watches 12 noon to 4, 4 to 8, and 8 to 12 midnight, and all of the watches through the 12th until 8 A. M. on

the 13th, continuously; and from then on the pumps were put on No. 2 hold as well.

The only explanation offered by the claimant and respondents is the storm.

On Jan. 9th, the vessel ran into a small local blow with the wind from the N. NW; force about 5 to 6 (Beaufort Scale); the storm lasted for about 24 hours. Then, after a lull of 12 hours or so, sometime during the night of Jan. 10th–11th, the storm increased in force, and when the Second Officer came on watch at 4 A. M. on January 11th, it was quite rough. The vessel was rolling and pitching heavily and shipping heavy spray over the weather decks. This condition continued until about 8 o'clock in the morning of January 11th when it moderated some. But, at four o'clock in the afternoon of that day, the seas and wind began to increase in intensity again, and, as the Otho passed within 50 miles of the center of the storm, became more violent and continued so through the 12th, 13th and 14th, but moderated during the 15th, gradually improving until arrival in New York.

Much evidence was offered to show the effect of this storm on other vessels within a comparable area. The S/S Santa Rosa, of the Grace Line, sailed out of New York on the evening of Jan. 10th, in good weather, for Bermuda. She reached Hamilton 3 days and 3½ hours later; her normal running time was 36 to 38 hours. In the forenoon of Jan. 11th she encountered rough weather and hove to at 8:35 A. M. on that day until 5:20 A. M. on Jan. 13th, traveling only 40 miles in the first 24 hours.

On Jan. 11th, at noon, the Otho was 240 miles south and 100 miles East of the Santa Rosa which, on Jan. 13th was 55 miles West and South of the Otho. From 4 p. m. on Jan. 11th to 4 p. m. on Jan. 12th, the log book of the Santa Rosa indicates wind force was 9 to 10 Beaufort Scale; waves 30 to 35 feet high from trough to crest; roll 52 degrees starboard, 39 degrees port.

Chief Officer Printzlau of the Otho had testified the vessel was down by the head on Jan. 11th, but later corrected this statement and agreed with the Captain, Chief Engineer and other witnesses, that it was the 13th instead, which I find to be the fact. About that time, and again, later, palm oil cargo was pumped overboard but the vessel still remained notably down by the head.

■ However, I am forced to the conclusion that the H-3 plate was cracked and the water leaking into No. 1 hold before the storm attained its "catastrophic character" which would naturally aggravate the fracture.[1]

The question thus presented is whether the owner exercised reasonable diligence to make the vessel seaworthy before she sailed from New York (voyage 34) on Oct. 31, 1940.

■ The duty of the carrier to use due diligence is not satisfied by delegating that duty to a third person. Philippine Refining Corp. v. United States, D.C., 29 F.2d 134, Id., D.C., 33 F.2d 974, affirmed 2 Cir., 41 F.2d 1010; the Bill (Brazil Oiticica, Inc. v. S. S. Bill), D.C., 47 F.Supp. 969.

Captain Sparrow, a man of wide experience and unquestioned capability, Marine Superintendent for the American West African Line, made an inspection of the vessel in October, 1940. As soon as the cargo had been removed he made an observation of the interior of the vessel including hold No. 1. He did not climb up on any of the longitudinal stringers but stood on the tank tops and made a general observation of the condition of the holds. The majority of the cargo battens were in place at that time. The vessel then went

---

[1] Seas: (From the log books)
Moderate and choppy until Jan. 7th; then rough, heavy swell, until Jan. 11th; very high and very rough on Jan. 12; high Jan. 13; rough, Jan. 14 and 16th, less on 15th.

Vessel rolling easily Jan. 4; moderately, Jan. 5; pitching easily Jan. 6; pitching deeply at times and rolling heavily, shipping water over decks fore and aft Jan. 7; pitching and rolling heavily at times and shipping water Jan. 8 and 9th; rolling heavily and moderately at times and shipping water over decks, Jan. 10; rolling and pitching heavily Jan. 11th, 12 midnight to 8 A. M.; rolling and pitching moderately Jan. 11, 12 noon to 4 p. m.; pitching and rolling heavily to heavy; N. W'ly sea. Hove to with engines on half speed Jan. 11, 8 to 12 p. m. Vessel rolling and pitching heavily in high and dangerous sea, wind force 9–10 during squalls Jan. 12, 12 noon to 8 p. m. Rolling and pitching heavily in precipitous and heavy sea Jan. 12, 8 to 12 midnight. Vessel hove to in high and dangerous sea; engines on half speed, vessel rolling and pitching heavily; fore deck continuously awash Jan. 13th and 14th.

to the repair yard where it remained for three weeks and during 14 days of that period, was in drydock. It was then that Captain Sparrow made an inspection of the exterior. The outside plating had last been partly scaled in May, 1939; there are no drydocking facilities for vessels of the type of the Otho on the West African Coast.

Without particularizing the details of his examination, he stated he found the condition of the plating to be good and gave a memorandum of his observations to the Chief Officer, advising him to use every opportunity to do the work outlined therein, including the painting of the holds, as they became accessible.

From his testimony the Court cannot say that his inspection was of a character to be expected of him, having in mind that the vessel had sustained heavy weather damages necessitating the expenditure of $49,043.48 in effecting repairs.

The Otho was subject to regular inspections by the American Bureau of Shipping [2] which, based thereon, had issued, and continued, its certificate rating and classifying the vessel A-1.

On Oct. 31st, 1939, the U. S. Bureau of Marine Inspection and Navigation, Department of Commerce, made its annual inspection and the American Bureau of Shipping undertook its Second Special Survey No. 2, which was also the commencement of the 5th of a 4 year period survey.

On a survey conducted at New York March 3, 1940, on which occasion the vessel was dry docked for sighting-account of grounding, the plating was examined and hammer tested by the Government Inspector, and the Bureau surveyor reported, inter alia,—

"1. The stem, stern frame, outside plating, rudder and propellor were examined and found satisfactory, except as follows:

"2. The fore-foot plate, port and starboard, No. 1 plate in 'F' strake port and starboard, the two aft keel plates and the aft keel butt strap were found wasted and recommend that they be further examined at the next dry docking and dealt with as found necessary."

On Sept. 22, 1940, the Otho sustained heavy weather damage and underwent a drydock inspection by the U. S. Bureau of Marine Inspection and Navigation, Department of Commerce, and a Heavy Weather Damage Survey by the American Bureau of Shipping, as well as a continuation of the Second Special Survey No. 2.

On October 8–10, 1940, the U. S. Bureau of Marine Inspection and Navigation, Department of Commerce, represented by Alexander Paul, Jr., made its annual inspection of the Otho; he examined the hull structure, including shell plating, inside and outside where accessible.

He testified he walked around under the ship; examined every plate and where there appeared to be indications of corrosion he tested them with a hammer, and the same with the rivets, of which there were 2,100 either renewed, welded or caulked, and several seams started which were caulked and welded. Plates E-2 and F-3 on the portside were released, faired and refastened. He examined the shell plating on the inside of No. 1 hold; his examination consisted of looking at them, observing that there were no signs of *excessive* deterioration or wastage and testing those places with a hammer. The cargo battens were in place, but he looked behind them with a flashlight and found the

---

[2] C 7379  March 9, 1940
    Tailshaft and annual Boiler survey item 2, See C.8916  See also C 7345 — Ex.Lyeth 2 (Hunt)

C 8857  October 18, 1940
    Deep tank and after peak tank  Cert. attached Oct. 18, 1940 — Ex. Z-2 (Lucey); Ex. Z-3

C 8915  October 18, 1940
    Heavy weather damage Sept. 22, 1940 — Ex. Z-1 (Lucey and Narter)

C 8916  October 18, 1940
    Con. 2nd Special Survey #2 Annual Boiler Survey — Ex. Z-4 (Lucey and Narter)

C 9623  February 14, 1941
    Further Heavy Weather Damage Dec. 29, 1940 to Jan. 16, 1941 (see note appearing here as C7345) — Ex. Hill 3 (Narter, Lucey and Walker)

C 9631  February 15, 1941
    To continue 2nd Special Survey #2. — Ex.Lyeth 3 (Narter)

condition of the inside shell plating good with no *excess* wastage; nevertheless his Report Ex. EEE-3 states that the plating was neither bored nor hammer tested at this examination.

Mr. Lucey, employed by the American Bureau of Shipping made his first examination on Oct. 9, 1940. The purpose of this survey was to determine what damage the vessel sustained by the heavy weather reported to have occurred Sept. 22, 1940, with a view to restoring the ship to its original condition as it existed prior thereto.

He testified that he walked around the vessel close enough to touch her bottom and could see all sides from the drydock floor. In this way he examined the outside shell plating and saw no *unusual* signs of corrosion or grooving. He did not make an inspection of the hold (No. 1). His recommendations were carried out to his and the satisfaction of Mr. Narter, who made a later inspection.

Mr. Lucey also made a report based upon his inspection under Special Survey No. 2 and gave credit for the work done in compliance with the Heavy Weather Damage Survey which was duplicated in this report. He had made an inspection in March 1940 (Item 2) but in the inspection which he made on October 9, 1940, while he looked at the No. 1 plating in F-strake, port and starboard, he made no recommendation with respect thereto. Although he saw that it was wasted he did not deem it necessary to do anything about it at that time.

Mr. Lucey stated the practice was to allow 25% wastage, although he did not know what the original thickness of the shell plates were when the vessel was built, and the proof is that the 25% rule of the Bureau was discarded 10 years ago.

Mr. Narter also surveyed the Otho October 10, 1940, and stated he "carried it out alone." He made a hurried examination of her bottom on drydock, a general examination when he was called in to continue the survey of March 1940, in connection with which he testified *doublers* were welded over the waste section of No. 2 keel plate and butt strap (item 2, supra) and made a more comprehensive examination in the forward end during the testing of the forepeak tank on the outside and forepeak bulkhead and No. 1 hold and also the forepeak flat in the forward lazarette, but there was no hammer test or boring of the shell plate of the No. 1 hold.

Testimony was offered by the claimant and respondents to show that on the return voyage of the Otho (No. 34) enroute from Matadi to Lagos, a distance of more than 1,000 miles, the shell of the ship in hold No. 1 was carefully inspected by the Master and Chief Officer, and scraped, wire brushed and painted by some 20 Kroo boys, members of a native African tribe, taken aboard these vessels at Monrovia, inbound, and released at the same port, outbound, and that no substantial evidence existed indicating that the No. 3 plate in the H-strake, or any other plate was defective.

The Chief Officer divided his supervision of this work into four inspections:

(a) Before doing any work, leaving Matadi, chalk marking the work to be done

(b) When the head man reported one section cleaned and scraped

(c) When the wire brushing and dusting was finished, and

(d) After the first coat of paint had been applied.

Between the third and fourth inspections, the Master visited No. 1 hold, for about 20 minutes, and examined the job.

His detailed description of the method of his observations of hold No. 1, and particularly the shell plating, is flatly contradicted by the Chief Officer which, together with other circumstances in the evidence, creates a doubt in my mind that it was thorough and efficient.

On January 27, 1941 a further examination of the Otho, due to heavy weather damage, was made by the U. S. Bureau of Marine Inspection and Navigation, Department of Commerce. The report shows that the plating was both bored and hammer tested.

Mr. Narter testified that he carried out a thorough examination of No. 1 hold and 'tween decks at that time "by searching out with my flashlight, used as a guide, and then using my hammer and digging around along the heels of the longitudinal frames" and discovered those areas mentioned in his report of February 15, 1941.

To set forth pertinent excerpts of his report would unnecessarily extend this

opinion which, in any event, will reach undue length.

Mr. Narter bored 8 plates to determine their thickness, and required the removal of two and the repair of others before the Second Special Survey No. 2 could be considered as completed.

Reference is made to the foregoing report because it indicated to the Court the determination made possible by a more complete post-examination and test.

Mr. Narter also made an extensive report dated February 14, 1941, of an examination "at the request of the Owner's representative" "on damage stated to have been sustained *as a consequence of heavy weather encountered from December 29, 1940 to January 16,* 1941, while on the voyage from West African ports to New York with cargo," in which he found:

"1. Plate No. 3 in 'H' strake from forward cracked for about 3' above longitudinal near center of plate."

Mr. Narter testified that he had discussed plating fractures in Isherwood type vessels with his superior surveyors and technicians and recollected there had been a circular issued to that effect by the Bureau. It was later produced and reads as follows:

"May 20th, 1937.

"From: Mr. D. Arnott
"To: All Surveyors
"Subject: Circular Letter No. 5-37
        Fractured Shell Plates On
        Longitudinally Framed Ships.

"Gentlemen:

"We have had one or two cases recently of shell plating in way of the forward hold fracturing at sea, causing flooding and serious damage to cargo. Upon examination it was found that these fractures were due to corrosion and grooving along the line of the top of the longitudinals, these grooves extending in some cases through half the depth of the shell plate (see sketch attached). The wastage at the frames was apparently caused by an accumulation of moisture or sweat, intensified in some cases by cargo deposits, such as, sulphur, and as the grooves are to some extent filled with rust the condition is not always easy to find unless specially looked for.

"You might be good enough to give this matter your attention on every available occasion when surveying the holds, especially the forward hold, of longitudinally framed ships in order that such corroded and defective plating can be renewed in time to prevent such fractures.

"Yours very truly,
"American Bureau of Shipping
"D. Arnott—Chief Surveyor."

It was reissued about April, 1940, following the experience in the Zarembo case.

A great deal of testimony was given by expert witnesses based upon their inspection of the shell plate in question after it had been removed from the Otho's hull. Much of this testimony had to do with grooves, fillets, gulleys, stresses, corrosion, fatigue and corrosion-fatigue. The Otho, like every other vessel of similar construction was subject to panting and the stress and strain incident thereto. Moisture, whether resulting from sweat or water, inevitably leads to corrosion, and in due time steel plates wear out and give away.

Corrosion-fatigue seems to me to have been interjected into this case as the basis of an argument that corrosion is so accelerated by fatigue that the giving away of the corroded area is too sudden to be anticipated by any present known means.

In Asiatic Petroleum Co. v. Lennard Carrying Co., 1914 1 K.B. 419, the court said: "If the ship is allowed to go to sea in an unfit state, grave consequences follow. The lives of many men are at stake, and very valuable property. The utmost care must be taken. The duty must be fulfilled most thoroughly." See, also, Hines v. Butler, 4 Cir., 287 F. 877.

The Poleric, D.C., 17 F.2d 513; Bank Line v. Porter, 4 Cir., 25 F.2d 843, 845, where the court said: "the diligence required is 'diligence with respect to the vessel, not in obtaining certificates' [citing cases]. 'Certificates of surveyors and inspectors giving high rating have been disregarded, where vessels have been found unseaworthy in fact.'" (citing cases)

Considering the age of the vessel and that the No. 3 plate in the H-strake was one of the vessel's original shell plates; the developed tendency about 1937 of plates in the forward hold of longitudinal frame ships (of the approximate age of the Otho) to crack from deterioration resulting from panting and corrosion, and the injuries sustained by the Zarembo, I am forced to the conclusion that the Otho was not seaworthy at the time the vessel sailed from New York Oct. 31, 1940; that the owner did not exercise reasonable diligence to

make the ship seaworthy and that the cracking of said plate resulted by reason thereof.

There is proof in this case that some damage resulted from the storm. When the motorboat on the well-deck was carried away, the canvas tarpaulins covering the No. 2 hatch were torn and permitted the entry of sea water into the No. 2 'tween decks.

There is also evidence that the wire reel was broken and carried away from the forecastle head; 3 locking bars over No. 1 hatch were torn away; a number of sections of the pipe guard were damaged and a load of logs on the after deck displaced; the ship's bell and standard fastened to the forecastle head deck were carried away; the starboard water tight doors leading to the shelter deck on bridge-deck were sprung.

There is also proof that because of high seas during the storm, and damage to the ventilators, a condition of sweat was produced which, to some extent affected the cargo. But the facts have not been sufficiently developed to enable me to make specific findings as a basis of an apportionment of the damages from the several causes contributing thereto.

There must be a decree for the libellants in each case with a reference to a Commissioner to compute the damages sustained.