**DOW CHEMICAL CO. (U. K.) Ltd.,**
**Plaintiff,**

v.

**S. S. GIOVANNELLA D'AMICO, her engines, etc. and D'Amico Societa Di Navigazione, S. p. A., Defendant,**

**Dow Chemical International Limited, S. A., Impleaded Defendant.**

**No. 61 AD. 684.**

United States District Court
S. D. New York.
March 31, 1969.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiff; by J. Edwin Carey, New York City, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, for defendant; by Francis J. O'Brien, and Howard M. McCormack, New York City, of counsel.

Vincent J. Ryan, New York City, for impleaded defendant.

## OPINION

POLLACK, District Judge.

The plaintiff seeks to recover the loss arising from damage to a cargo of styrene monomer carried in defendant's vessel from Canada to Europe. Plaintiff claims that it turned over to defendant approximately 1,006 tons of clear water-white styrene monomer and that defendant delivered the chemical at Rotterdam seriously discolored and 11½ tons short of the shipped weight.

The plaintiff is Dow Chemical Company (United Kingdom), Ltd. (hereinafter Dow UK), a British corporation. The defendant is D'Amico Societa Di Navigazione, S.P.A. (hereinafter D'Amico), an Italian corporation, which owns the S/S "GIOVANNELLA D'AMICO". The impleaded defendant is Dow Chemical International Limited, S.A. (hereinafter Dow International), originally a Venezuelan corporation and now a Panamanian corporation; Dow International chartered a portion of the vessel for the shipment.

The subject of the suit, styrene monomer, is a petrochemical used in the manufacture of plastics. Dow Chemical Company of Canada (hereinafter Dow Canada) manufactured the styrene monomer in question at its plant in Sarnia, Ontario. Dow UK bought the styrene there and directed Dow International to ship it to London; later, Dow UK changed the destination to Rotterdam.

The cargo was loaded aboard the GIOVANNELLA on 7 November 1960 at Sarnia and the ship sailed the following day. After a stormy North Atlantic passage, the vessel arrived at Rotterdam on 25 November 1960.

The styrene monomer, as manufactured at Sarnia, was a clear water-white liquid. Plaintiff introduced documentary evidence at trial that the cargo was delivered to the ship at Sarnia in apparent good order and condition and that when delivered at Rotterdam it was a brownish yellow which materially impaired its value. Ordinarily, this would have been enough to establish a prima facie case, leaving the defendant, in order to avoid liability, with the necessity of proving that it exercised due diligence to make the ship seaworthy—that is, fit for the carriage of the cargo. Schnell v. The Vallescura, 293 U.S. 296, 303–305, 55 S.Ct. 194, 79 L.Ed. 373 (1934).

However, where the cargo may contain a hidden defect or inherent vice present at the time of shipment and not readily discernible, then plaintiff must show delivery to the ship in actual good order and condition in order to establish its prima facie case. Elia Salzman Tobacco Co. v. S. S. Mormacwind, 371 F.2d 537, 539 (2d Cir. 1967); The Niel Maersk, 91 F.2d 932 (2d Cir. 1937).

Dow Canada personnel and their independent cargo surveyor, The Saybolt Company, took numerous samples of the styrene monomer from the end of the

loading line and a few samples from the GIOVANNELLA's tanks while the cargo was being put aboard. At least ten of these samples were subjected to more or less complete chemical analysis by a technician at Dow Canada's Sarnia laboratory. However, the logbooks in which the technician's results were originally recorded were not introduced at trial, having been inexplicably destroyed by Dow Canada after the commencement of this litigation. The samples themselves were likewise inexplicably discarded after this controversy had arisen. Nor was the technician himself produced, despite the fact that he was still employed by Dow Canada well after the suit had begun.

Instead, plaintiff introduced at trial a summary table of the results of ten of the chemical analyses, with only four of these being reported in full. This table had been prepared by the supervisor of the Dow Canada laboratory five months after the cargo was loaded aboard the GIOVANNELLA. Plaintiff also introduced a memorandum prepared by this same supervisor shortly before this suit was commenced which set forth the same results in even more conclusory fashion. In addition, plaintiff introduced a letter, dated two weeks after the discoloration was discovered at Rotterdam, from a Dow Canada executive to a "Claims Agent" setting forth a single set of figures, evidently a composite of some sort of the analyses of eleven samples taken from the end of the loading line.

These documents, if credited, would tend to establish the actual good order and condition of the styrene monomer at loading. (A few of the samples taken from the ship's tanks showed some discoloration; these will be discussed further below.)

██ However, it is well settled that the intentional destruction of a document or object relevant to the proof of an issue on trial can give rise to a strong inference that its production would have been unfavorable to the spo-

liator. Richardson on Evidence, § 91 at p. 64 (9th ed. Prince 1964); Fisch on New York Evidence, § 1127 at p. 554 (1959). Moreover, where a witness is under the control of a party and could testify, if called, to material facts, the failure to call that witness can give rise to the strongest inference against that party which the opposing evidence permits. This is particularly true where the testimony would be important and where it can be inferred that the witness would ordinarily tend to be favorable to that party. Richardson on Evidence § 92 at pp. 64–65 (9th ed. Prince 1964); Fisch on New York Evidence, § 1126 at pp. 551–552 (1959); 1 Bender's New York Evidence, § 30 at pp. 443–444 (Frumer & Biskind 1968). See also A. C. Becken Co. v. Gemex Corporation, 314 F.2d 839, 841 (7th Cir. 1963); Matter of Eno, 196 App.Div. 131, 163, 187 N.Y. S. 756 (1st Dept. 1921).

In addition, plaintiff introduced into evidence the testimony of another Dow Canada executive and of two Saybolt Company employees on the issue of actual good order and condition. Each of these men had either visually examined some samples taken during loading or studied them in the Dow Canada laboratory for color purity. However, examination for color did not necessarily rule out inherent vice, latent defect or other intervening cause of discoloration of the cargo. The proof did not indicate that these further samples were subjected to complete chemical analysis in addition to their examination for color.

At the close of plaintiff's case, defendant moved to dismiss for failure to establish a claim upon which relief could be granted. The Court reserved decision and the defendant then went forward in the discharge of the burden cast upon it by the plaintiff's proofs. The evidentiary problems discussed above thereupon became largely academic on the evidence presented by defendant affirmatively establishing the actual cause of the damage to the cargo and defendant's freedom from negligence.

Plaintiff's claim in this case is that the GIOVANNELLA was unseaworthy due to contamination in her No. 5 port and starboard tanks from a previous cargo.

Defendant introduced into evidence documents and testimony indicating that the No. 5 port and starboard tanks of the GIOVANNELLA had been cleaned and inspected three times prior to loading the cargo and found fit for the carriage of styrene monomer. The cleaning methods included extensive "butterworthing" followed by hand scraping.

The National Cargo Bureau inspected the tanks at the Port of Duluth after the initial cleaning was accomplished following discharge of the prior cargo of benzine. The National Cargo Bureau surveyor issued a certificate "to indicate preparedness of Tanks for STYRENE MONOMER cargo to be loaded at Sarnia and subject to approval by Surveyors at port of loading".

Cleaning of the tanks was continued on the trip from Duluth to Sarnia. Upon arrival, a Saybolt Company representative, acting for Dow Canada, inspected the tanks, found them fit for loading, and issued a certificate to that effect. However, a Dow Canada executive inspected the tanks and demanded more cleaning. This was done. After re-inspection, Dow Canada issued a certificate attesting that "Tank No. 5, Port and Starboard, on the tanker 'Giovannella D'Amico' was prior to loading Styrene Monomer inspected and found to be clean and dry and satisfactory to load above-mentioned cargo".

Plaintiff attacked the validity of this certificate on the ground that its inspectors were not fully informed as to the previous cargo in those two tanks of the GIOVANNELLA. It is undisputed that, prior to the styrene monomer, the No. 5 port and starboard tanks had contained benzine which had been used to flush out the dirty tanks of another vessel, the M/T COASTAL CARRIER. Cross-examination of plaintiff's witness, an independent cargo surveyor involved in the transfer of the benzine between the two ships, established that the benzine was owned by the Dow Chemical Company (of the United States), evidently the parent Dow company. A representative of that company had been present when the benzine was transferred from the GIOVANNELLA into the dirty tanks of the COASTAL CARRIER and then back into the GIOVANNELLA. This was done pursuant to an agreement between Dow and the owners of the COASTAL CARRIER.

The cargo surveyor acted at the request of and made his full report to T.J. Stevenson & Co. of New York, ship agents and brokers. Defendant introduced the testimony of a Dow International executive which established that T.J. Stevenson & Co. and its subsidiaries acted for Dow International in finding ships for the latter's cargoes; that T.J. Stevenson & Co. or one of its subsidiaries suggested and helped arrange the charter of the two GIOVANNELLA tanks for the styrene monomer; that Dow International inquired of and was advised by T.J. Stevenson & Co. or one of its subsidiaries as to the cargo previously in those two tanks; and that, at Dow International's request, a special cleaning provision was typed into the charter party entered into with D'Amico [Part I, ¶ H(2)].

Plaintiff further argued that the certificates of inspection and approval were not enough to establish the ship's due diligence, relying in particular on Petrofina, S.A. v. Cia. Italiana Trasporto Olii Minerali, 57 Lloyd's List L.R. 247 (C.A. 1937). In that case the charter party at issue imposed an unqualified obligation upon the shipowner to make the ship clean and fit and to keep it that way. The charter party in the instant case provided only that "[t]he Owner shall before and at the commencement of the voyage exercise *due diligence to make the Vessel seaworthy* * * * and to make the tanks * * * in which the cargo is carried fit and safe for its carriage and preservation". [Emphasis added.]

Another important difference between the charter party in the instant case and that involved in the *Petrofina* case is that the latter provided only that the ship was to "clean for the cargo in question to the satisfaction of charterers' inspector". The English court emphasized that there was nothing in that clause that expressly lessened the unqualified obligation of the owner to make the ship clean and fit, imposed in the earlier clause mentioned above. In the charter party before this Court, however, the analogous cleaning and inspection clause (Part II, ¶ 16) expressly provided that "[a]cceptance of the Vessel by the Charterer or loading the cargo shall be a complete fulfillment of the Owner's obligations under this clause".

▮ The obligation of due diligence places a heavy burden upon the shipowner. The Otho, 49 F.Supp. 945, 950 (S.D.N.Y.1943), aff'd sub nom. Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 139 F.2d 748 (2d Cir. 1944), cert. den. American West African Line v. "Huilever" S. A. Division Huileries Du Congo Belge, 322 U.S. 735, 64 S.Ct. 1047, 88 L.Ed. 1568 (1944). Nonetheless, the documents and testimony on this issue, as enumerated above, provide convincing and essentially uncontradicted evidence of defendant's fulfillment of its obligation. See The Vermont, 47 F.Supp. 877 (E.D.N.Y.1942).

Thus, even if a plaintiff has established a prima facie case, the burden which is then shifted to the shipowner is "to bring itself within an excepted cause or to prove it exercised due diligence to avoid and prevent the harm * * *." Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 429 (2d Cir. 1962). The Court finds that the defendant did in fact exercise due diligence.

The evidence of defendant persuasively established, further, that the actual cause of the discoloration of the cargo was not attributable to the defendant. The defendant presented proof from which the Court finds that the manner of loading the styrene monomer into the tanks of the GIOVANNELLA at Sarnia was the responsible cause of the ultimate discoloration; this was as follows:

Initially the styrene was in a large storage tank on shore. Metal piping ran from the tank to the ship's pier. Flexible hoses were used to carry the styrene the final distance from the pier into the No. 5 port and starboard tanks, which were approximately 45 feet deep. The loading was accomplished through the overhead hatches of the tanks, with the hoses extending downward approximately five feet inside. Thus the styrene initially was dropped approximately 40 feet into the tanks—the distance of the drop diminishing, of course, as the tanks filled up. A Dow Canada executive supervising the loading testified that the liquid fell "with considerable force and a great deal of agitation". The loading continued in this manner for approximately six and a half hours. Upon completion, there remained approximately ten feet of space filled with air between the surface of the styrene monomer and the tops of the tanks. The hatches were then closed and the crew forbidden to go near them because the captain considered the cargo to be dangerous.

The entire loading operation was under the control of Dow Canada and was performed by their personnel on shore and on the vessel. The vessel's officers and crew took no significant part in the loading. Dow Canada personnel and their Saybolt Company surveyor also took all of the samples from the end of the loading line and from the ship's two tanks. Several of the samples from the tanks showed some discoloration. Dow Canada attributed this first to dirty corks in the sample bottles and then to dirty gloves on the man taking the samples; both of these theories were later discarded. The captain of the GIOVANNELLA was not informed of these off color samples.

The defendant introduced at trial an expert who testified that the manner of

loading the cargo described above had been improper and had caused the discoloration of the styrene monomer. The expert, a professor of chemistry and Dean of Research at Brooklyn Polytechnic Institute, is a specialist in polymer and colloid chemistry with broad experience in research and in industrial and military consultation. He has also done work in the field of rheology, which is the study of the mechanical behavior of materials, particularly the flow of liquids.

To a lengthy hypothetical question that substantially reflected the relevant facts in the case, defendant's expert made the following reply:

In my opinion, then, the loading proceeded in such a way that the styrene monomer had a 35 foot free fall at the beginning of the loading, 35 feet from the end of the hose to the bottom of the tank, which of course eventually decreased as the styrene level rose in the tank. Still, there was a free fall of styrene through air, according to what you just told me, of approximately two to three hours for each tank; that during this period the styrene was in intense contact with air, and could absorb any—and could saturate itself with oxygen from the air.

I believe that some of the yellowing which was observed after the loading was * * * already * * * due to part of the exposure to oxygen, which led to part oxidation of the styrene and conversion of the TBC [an inhibiting agent added to prevent premature polymerization during storage or transit] into brown colored compound, as the TBC absorbed and reacted with the oxygen that was then contained in the styrene.

I think it is also significant that the * * * TBC level in the styrene was raised by, as you told me, adding another ten pounds of TBC so that the content before sailing was 21

PPM [parts per million] of TBC. On arrival, the average level of TBC in the tanks was about 10 to 12 parts. So that during the voyage approximately 10 PPM of TBC had vanished, or the equivalent of about 10 pounds of TBC * * * had vanished during the trip. This means that this amount of TBC had been converted by oxygen into brown oxidation products.

Consequently, the color as determined in Rotterdam, in my opinion, was caused by oxygen uptake of styrene during the loading, oxidation of TBC during that time, general oxidation of TBC with residual oxygen in the styrene during the passage, and also general oxidation of TBC from the oxygen in the ullage of the tank [the empty space between the surface of the cargo and the top of the tank] during the voyage.

While nobody can say with certainty that all the color found in Rotterdam was due to this process, there can, on the other hand, be absolutely no question that a substantial amount of color would have been and was produced by these two factors.

Plaintiff also introduced at trial an expert with broad experience in polymer chemistry and related industrial consultation. Plaintiff's expert testified that, in his opinion, the styrene monomer had picked up a contaminant during the voyage and that the source could have been material which was in the tanks prior to the loading but which took time to dissolve, such as contaminants left on the walls of the GIOVANNELLA's tanks from the previous cargo of dirty benzine. The plaintiff's expert expressed the belief that the styrene itself could not have been sufficiently oxidized to cause the extensive oxidation to produce off color or to give any color whatsoever. The plaintiff's expert conceded on cross-examination that he was told that the ship's tanks were hand cleaned and scraped and that Dow had inspected these tanks on two occasions and passed the tanks. Plaintiff's expert stated that

an expert chemical analyst, with suitable time and equipment, would be able to isolate and identify and corroborate the presence of a contaminant. This witness did not rule out oxidation as a responsible cause for the discoloration; he acknowledged that it was a possible factor, but he placed more weight on his theory of a contaminant than on the effect of oxidation.

The proof showed that samples of the cargo taken in Rotterdam were sent back to Dow Canada's laboratory for analysis and that such a laboratory would have sufficient equipment to run a careful analysis of this product.

It appeared that Dow Chemical ran a complete quality control test on the samples sent back from Rotterdam and found no trace of sea water, no trace of fresh water, no trace of benzol, no trace of rust and no trace of any known contaminant. The quality control tests by Dow expressly found an absence of any foreign substance in the styrene monomer and there was nothing in the record which could support the thesis of this expert other than an inference drawn by him that a foreign substance should have been found and possibly could have been. found by a more detailed analysis if Dow had chosen to go to the trouble and expense of an all-out search. In fact, the discolored styrene monomer was subjected to extensive testing in the Dow laboratories; yet plaintiff's sales supervisor admitted that:

> Despite complete quality control tests conducted by Dow of Canada, the source of the contamination ha[s] never been established and to this day remains a mystery. *The tests showed no foreign substances.* [Emphasis added.]

Moreover, defendant introduced into evidence two technical bulletins prepared and published by the Dow Chemical Company (of the United States), in 1957 and 1961 respectively, as guides to the safe handling and storage of styrene monomers. These documents provide substantial corroboration to the testimony of defendant's expert on the cause of the discoloration. For example, the 1957 bulletin states:

> The main effect of air on the monomer seems to be an oxidation which forms aldehydes and peroxides. If excessive amounts of air are present, styrene monomer will become yellow * * *.

The 1961 bulletin states that:

> Oxidation products, hydrates, and metallic salts of TBC form highly colored compounds and can change the color of the monomer markedly. Therefore, rust, moisture, and air should be excluded from the monomer storage facilities * * *. Oxidized monomer may also react with the TBC inhibitor to discolor the monomer.

Further in the 1961 bulletin:

> An inert gas "pad" or "blanket" to exclude air and moisture from the vapor space above the stored liquid monomer is highly recommended.

In the 1961 bulletin, Dow lists only two proper methods of filling a tank with styrene monomer:

> The storage tank can be filled from the bottom or from the top *with a line extending to the bottom.* [Emphasis added.]

The plaintiff's expert agreed that a tank when top-filled should be filled by putting the hose all the way to the bottom of the tank to prevent development of foams, splashes, "just like pouring beer".

Resolution of conflicts between expert witnesses, particularly where both are men of integrity and repute, is seldom an easy task. Nevertheless, the proper choice in the instant case is clear. The contamination theory of plaintiff's expert is based upon the purest speculation —an inference on an inference, not on a fact—for there was no direct evidence

of a contaminant residue in the vessel's tanks. The evidence established clean and airtight tanks.

Defendant's expert on rebuttal made the assumption, for the sake of argument, that plaintiff's contamination theory had some validity and proceeded on this assumption to calculate how much residue from the prior cargo of benzine could have been left dried on the walls of the GIOVANNELLA's tanks without being seen during the several visual inspections by plaintiff's representatives and employees. When compared with the approximately 500 tons of styrene monomer which went into each tank, this residue—at most—might have amounted to from two to four parts per million. In the opinion of defendant's witness, that could not have been enough impurity responsibly to cause the severe discoloration of the cargo.

■ After reviewing all the facts and circumstances in the case, the Court concludes that there is a clear preponderance of the credible evidence in favor of the defendant's explanation of the damage.

At this point it becomes relevant to inquire into the question of who was responsible for loading the cargo onto the ship. Part II, ¶ 7 of the charter party provides that "[t]he cargo shall be pumped into the vessel at the expense, risk and peril of the Charterer * * * [and] [h]oses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer * * *." However, as plaintiff correctly points out, Part I of the charter party includes a Canadian Clause Paramount which expressly incorporates into the agreement all the terms of the Canadian Water Carriage of Goods Act and renders void any other term of the charter party inconsistent with the terms of the Act. *Cf.* Anglo-Saxon Petroleum Co., Ltd. v. Adamstos Shipping Co., Ltd., [1958] 1 Lloyd's List L.R. 73, 81 (H.L.). It is undisputed that Article III(2) of the Act provides that "the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried".

A mechanical way to resolve this conflict would be to follow the rule that where the first clause in the contract is general (as is the Canadian Clause Paramount) and the subsequent provision is particular (as is ¶ 7 of Part II), or if the later clause is repugnant only to part of the earlier, then the later clause (¶ 7 of Part II) is given full effect and the earlier clause subjected to such modification as that makes necessary. Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956); 4 Williston on Contracts § 624 at p. 822 (3rd ed. Jaeger 1961).

■■ But the function of the Court in construing the conflicting provisions of a contract is to find the intention of the parties; and there is no surer way to find out what the parties meant than to see what they have done. Brooklyn Life Insurance Co. v. Dutcher, 95 U.S. 269, 24 L.Ed. 410 (1877). It is well settled that where there is doubt or ambiguity as to the meaning of a contract the conduct of the parties in rendering or receiving performance under it—that is, the interpretation which they themselves place upon the contract—will be given considerable weight by the courts. Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F.Supp. 655, 667 (S.D.N.Y.1959), aff'd 280 F.2d 197 (2d Cir. 1960); 4 Williston on Contracts § 623 at pp. 789–790, 815–816 (3rd ed. Jaeger 1961); and *see, e. g.,* American Cyanamid Co. v. Ellis-Foster Co., 298 F.2d 244, 246 (3rd Cir. 1962); Hammond v. C. I. T. Financial Corp., 203 F.2d 705, 707 (2d Cir. 1953); Tyler v. New York Telephone Co., 192 F.Supp. 52, 57–58 (S.D.N.Y.1961); Reconstruction Finance Corp. v. Commercial Union of America Corp., 123 F.Supp. 748, 754 (S.D.N.Y.1954); Restatement, Contracts § 235(e) (1932); *but cf.* Ports-

mouth Baseball Corp. v. Frick, 278 F.2d 395, 400–401 (2d Cir. 1960).

On this issue the evidence is clear. The manager of Dow International, the charterer, testified that under the terms of the charter, Dow personnel were to supervise the loading and arrange for independent surveyors. Accordingly, he requested Dow Canada to supervise the loading; in addition, he told Dow Canada to put the styrene monomer in tanks which had previously held benzine. The testimony of the Dow Canada supervisor and of the GIOVANNELLA's captain and the concession on the trial are in accord in establishing that the loading operation was performed entirely by Dow Canada and its representatives on shore and on board; the vessel's officers and crew played no significant part in these operations. Nor was the vessel's equipment used; the pumps, piping and hose were all supplied by Dow Canada.

■■■■ The Court concludes that it was the intention of the parties to the charter party that Dow International be responsible for the loading operations at Sarnia. Whether this was the meaning the parties gave to the charter party at the time they signed it or whether they sometime later tacitly agreed to this meaning is an irrelevant question under the facts of this case. "A promisor, even though his promise has been put into clear written words, can always add to it, modify it or wholly replace it by a subsequent tacit agreement, one in which his own promises are found wholly by inference from conduct other than words." 3 Corbin on Contracts § 564 at p. 297 (rev. ed. 1960). Under either approach, Dow International is the responsible party.

■■■ The remaining issue before the Court is plaintiff's claim that the cargo delivered at Rotterdam was approximately 11½ long tons less than the amount for which the master of the vessel had receipted at the time of loading. Plaintiff introduced into evidence a cer-

tificate from its independent cargo surveyor, The Saybolt Company, declaring that 2,254,423 pounds (1,006.439 long tons) of styrene monomer had been loaded on board the GIOVANNELLA at Sarnia. Plaintiff further introduced six certificates issued by its independent cargo surveyors at Rotterdam, Laboratorium D.J.W. Kreulen, which plaintiff asserted, established that the cargo delivered amounted to only 995 long tons.

The Kreulen certificates were not delivery receipts but merely expressed measurements of quantities of the chemical found in various shore tanks or lighters. There was nothing in the certificates which necessarily established that those amounts represented the sum total of the styrene monomer which had been on board or was removed from the GIOVANNELLA at Rotterdam. The certificates themselves bore no notation connecting the amounts measured with the total cargo on board or removed from the vessel.

Defendant introduced into evidence a "Dry Tanks Certificate" issued by the Dow Chemical Company at Rotterdam which declared that:

> THIS IS TO CERTIFY THAT FROM m/c GIOVANNELLA d'AMICO, all cargo of STYRENE MONOMER has been discharged * * * and after discharging the tanks was [sic] inspected and found empty and dries [sic].

The Court has compared the ullage figures in the Saybolt certificate issued upon completion of loading at Sarnia with the ullage figures in the Dow certificate issued at Rotterdam. Ullage, as counsel for plaintiff explained, is the distance from the top of a tank down to the surface of the cargo. By comparing the known volume of the tank with the computed volume of the empty space above the cargo, one can establish the volume of the cargo and then its weight. The ullage figures at Sarnia appear to be larger than those reported at Rotter-

dam, despite the fact that the temperatures reported at loading and discharge were approximately the same. That is, the empty space in the tanks after loading at Sarnia is reported as larger than the empty space in the tanks before discharge at Rotterdam.

In the face of such incomplete and self-contradictory evidence, the Court concludes that plaintiff has failed to sustain its burden of proof on the issue of the alleged shortage of styrene monomer at delivery.

The Court finds that the defendant exercised due diligence to make the vessel seaworthy; the tanks of the vessel were fit to receive the styrene monomer; and the vessel was seaworthy for the purposes of carriage of that cargo. The styrene monomer did not become off-color as a result of contact with any residue of material which either was left or found its way into the tanks of the vessel. The defendant has sustained the burden of proof that it was free from fault.

The Court concludes that the damage to the cargo of styrene monomer shipped on board the GIOVANNELLA was not due to any cause for which defendant is responsible but rather was due to causes for which impleaded defendant, Dow International, is responsible under the charter party; nor was plaintiff's claim of shortage at delivery established by it by a preponderance of the evidence. The claim of plaintiff Dow UK against defendant D'Amico is accordingly dismissed on the merits with costs to said defendant against the plaintiff.

Since defendant is not liable to plaintiff Dow UK, the claim of defendant D'Amico against the impleaded defendant Dow International has become moot and is accordingly dismissed without prejudice and without costs.

The foregoing shall constitute the findings of fact and conclusions of law as required of the Court under Rule 52(a), F.R.Civ.P.

So ordered.