In re MACMILLAN, INC. et al., Debtors.

In re MCC GAO, INC. f/k/a Official Airlines Guides, Inc. et al., Debtors.

The MAXWELL MACMILLAN REALIZATION LIQUIDATING TRUST and MCC GAO, Inc., Counterclaim–Plaintiffs,

v.

Sheldon J. ABOFF, Counterclaim–Defendant.

Bankruptcy No. 93 B 45625 (TLB), 93 B 44970 (TLB), and 93 B 44971 (TLB). Ad. Nos. 94–9495A (TLB), 94–8496A (TLB).

United States Bankruptcy Court, S.D. New York.

Jan. 17, 1997.

Milbank, Tweed, Hadley, & McCloy, New York City by George Brandon, Andrew J. Fields, and John M. Conlon, for Debtors.

Solovay Marshall & Edlin, P.C., New York City, by Richard A. Edlin and John F. Wirenius, for Sheldon J. Aboff.

### DECISION ON ALLEGED EMPLOYMENT CONTRACT AND DEBTORS' COUNTERCLAIMS

TINA L. BROZMAN, Chief Judge.

Sometime in 1991, the year in which the empire of the late Robert Maxwell ("Maxwell") subsequently faltered, his son Kevin signed a brief but unusual letter agreement with Sheldon Aboff, the Maxwells' U.S. man on the spot, which guaranteed Aboff, who was in his early forties, lifetime employment and, when he was terminated, entitled him to some $23 million—money which Aboff is now seeking. Despite its extraordinary nature, this letter never stated which of the Maxwells' hundreds of companies was to be responsible for the hefty sums promised. Aboff claims that the $23 million is an obligation of Macmillan, Inc. ("Macmillan"), a solvent chapter 11 debtor which, after paying off its creditors, has upstreamed the proceeds from the sale of its assets to Maxwell Communication Corporation, plc, its corporate parent, for distribution in accordance with that company's plan of reorganization.

The letter agreement not only fails to identify the obligor, but makes no mention whatsoever of Macmillan. So how is it that Aboff links Macmillan to the obligation? First, he points to the fact that the letter is printed on Macmillan letterhead. That, however, is pure happenstance; Aboff's secretary testified that *she* chose the letterhead when she printed the letter from her computer screen. Second, as an aid to interpretation of the ambiguous letter, Aboff proffers notes which purport to show that after his move out of Macmillan's offices he was nevertheless to continue to perform all of his services at the behest of Macmillan, albeit for other Maxwell companies. Initially, these notes posed something of a problem for Macmillan, that is, until it was discovered that Aboff had doctored them to diametrically change their import before they were produced in discovery. As originally recorded, the notes actually confirm the testimony of Macmillan's president that Aboff had been transferred out of Macmillan and into a different chain of Maxwell companies prior to the execution of the letter agreement. Aboff's response to the charge of evidence-tampering is that he characteristically amended notes with successive meetings. I might have been more inclined to believe him had he revealed, rather than hidden, the amendments and had the changes been more wide-ranging. However, the singular effect of the amendments was to change Aboff's removal from to his retention by Macmillan. And Aboff's lack of veracity was not confined to the flap over the notes, more about which will be said later.

Aboff attempted to prove that he was still technically an employee of Macmillan at the time of his resignation. That, however, is really not the issue. The issue is whether his employment agreement, executed in the year following Aboff's move into a different chain of companies, was intended to bind Macmillan.

Aboff also suggests that if Macmillan is not liable, MCC GAO, Inc. ("OAG") is. However, Aboff concedes that he never performed services for OAG, which functioned as a paying agent for other Maxwell companies.

## I.

### A. *How Aboff Came to Join Maxwell*

Sheldon J. Aboff, a certified public accountant, worked from 1967 to 1975 at the New York office of the international accounting firm of Price Waterhouse, where he participated in the audits of the American businesses of Robert Maxwell. The two men developed a good working relationship, culminating in 1975 when Maxwell invited Aboff to join Maxwell's wholly-owned company, Pergamon Press, Inc. ("Pergamon Press") as treasurer and chief financial officer. Aboff's performance was obviously to Maxwell's liking, because prior to Maxwell's acquisitions of substantial publicly-held U.S. companies Aboff became chief financial officer of all Maxwell companies in North America. By 1981, Aboff rose to vice chairman of the board of directors of Pergamon Press and was responsible for administration, finance, and operations (with the exception of publishing and marketing).

### B. *The Birth of the Public Side*

Aboff joined Pergamon Press at a time when the businesses were predominantly closely held by Maxwell and his family. A change occurred, however, in 1980 when Maxwell acquired majority control of British Printing, plc, a U.K. public company which he renamed Maxwell Communication Corporation, plc ("MCC") [1]. Aboff provided services to Maxwell in connection with the latter's acquisition of majority control of MCC.

The Maxwell business empire thereafter came to comprise two types of companies, those which were completely owned and controlled by Robert Maxwell and his family, identified by insiders as the "private side," as well as MCC and its subsidiary companies, which had a minority public shareholding, and thus were known to insiders as the "pub-

---

1. After Maxwell acquired British Printing, plc, the company underwent a series of name changes which ultimately rested with Maxwell Communication Corporation, plc. For simplicity's sake, I will refer to the company as MCC, whether or not it was named that at the time.

lic side." [2] Trial Transcript at 736 [3]; *see Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan)*, 186 B.R. 35, 38 (Bankr.S.D.N.Y.1995).

In the 1987 "Project Exodus," Maxwell sold Pergamon Press, a private side company, and many, but not all, of its publishing subsidiaries to MCC, N.A., a public side subsidiary of MCC. Notwithstanding the move of Pergamon Press from the private to the public side, Aboff continued to serve as one of its officers and directors. In 1987, Aboff was named treasurer of MCC, N.A. and later became its vice president. At the time, MCC, N.A.'s office was located at 777 West Putnam Avenue in Greenwich, Connecticut (the "West Putnam offices").

Aboff acquired an additional title in 1987, president of PH(US), Inc., known as "PH(US)I," a contraction of "Pergamon Holdings U.S., Inc." which was the U.S. private side holding company. PH(US)I operated out of the West Putnam offices. Among other assets, PH(US)I held title to the Pergamon Press businesses which had not been sold in Project Exodus.

PH(US)I operated as a conduit through which Maxwell made millions of dollars of intercompany transfers. Many of these transfers were effectuated by Aboff with the additional signature of one of the other two authorized signatories for PH(US)I. Aboff remained president and chairman of the board of PH(US)I throughout 1992, in contradistinction to what occurred with the public side, which will be discussed shortly.

## C. The Acquisition of OAG, Thomas Cook, and Macmillan

In late 1988, MCC made two major U.S. acquisitions, purchasing Official Airlines Guide, Inc. (now known as MCC GAO, Inc. and defined earlier in this opinion as "OAG") from Dun & Bradstreet, and successfully ten-

dering for the stock of Macmillan, the well-known publishing company, in a hostile takeover. These two companies and their subsidiaries constituted about eighty percent of the value of the public side at the time of MCC's bankruptcy filing. *Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan)*, 186 B.R. 35, 38 (Bankr.S.D.N.Y. 1995).

When MCC acquired OAG from Dun & Bradstreet, David Shaffer, OAG's president, agreed to remain, undertaking the additional duty of managing MCC's U.S. companies. Following the Macmillan acquisition, Shaffer assumed a management role in that company as well. In April 1989, Shaffer was appointed group vice president of the so-called Electronic Publishing Group, which comprised all those publishing companies in the scientific, technical, and medical areas. The Electronic Publishing Group was a division of the Maxwell businesses; the name has no legal significance. By March 1990, Shaffer had been appointed president and chief operating officer of Macmillan, where he remained until the publishing business was sold by MCC in December 1993 as part of the latter's reorganization.

At the time of OAG's acquisition, MCC also obtained from Dunn & Bradstreet an option to purchase a separately incorporated travel agency, Thomas Cook Travel, another of the entities managed by David Shaffer. MCC did not exercise the option, but instead assigned it to the private side, which purchased Thomas Cook Travel in April 1989, renaming it TCTI, Inc. ("TCTI").[4] Aboff worked on this acquisition on behalf of the private side. Because of his prior involvement with Thomas Cook Travel, Shaffer agreed to become a director of and was consulted regarding TCTI, although he was not charged with operating the business.

2. For the sake of brevity I sometimes refer to public side companies as "Maxwell owned" or a similar phrase notwithstanding that members of Maxwell's family may have held some of the shares.

3. The trial transcript will be referred to as "R." for record, followed by the specific page upon which the cited testimony appears.

4. The private side parent in this chain of companies was Robert Maxwell Group, plc, one of the companies from which Aboff said he resigned on December 18, 1991. Exhibit ("Ex.") SSS.

## D. *Aboff's Role Following the Acquisitions*

From the end of 1988 through the early part of 1989, Aboff worked on the integration of Macmillan into MCC, which was structured so that MCC, N.A. was merged into Macmillan, with Macmillan becoming a subsidiary of MCC. On this assignment, Aboff reported directly to Robert and Kevin Maxwell. His salary came from sources other than Macmillan. Operations of the related public side companies were moved into Macmillan's headquarters at 866 Third Avenue in New York City ("the Third Avenue offices"). Aboff moved to the same address.

In the spring of 1989, Aboff was assigned by the Maxwells to assist with the Electronic Publishing Group, reporting to Shaffer, its head. The Electronic Publishing Group included OAG, TCTI, Pergamon Press and those companies' subsidiaries. Soon after, finding it difficult to describe the diverse companies reporting to him, Shaffer coined the name "Maxwell/Macmillan Group," a title which, like the Electronic Publishing Group, had no legal significance but was used to refer to Macmillan, OAG and their subsidiaries as well as the few private side companies, including TCTI, for which Shaffer had responsibility.

While he was under Shaffer's supervision, a large portion of Aboff's job was to share with Shaffer historical and background information regarding the companies and personnel. Shaffer also put Aboff in charge of a few members of the Electronic Publishing Group to assess whether Aboff was an able senior manager. Later becoming dissatisfied with Aboff's performance, Shaffer removed from Aboff responsibility for all but one of those companies.

Shaffer's influence was growing, for that same fall (in 1989) he was made a director of MCC, the English public side parent company which owned both Macmillan and OAG. At about this same time, Shaffer, at Aboff's request, placed Aboff on OAG's payroll retroactive to the beginning of that year; Aboff had chosen the OAG payroll because it had the best benefits.

By the end of that year, the merger of MCC, N.A. into Macmillan was complete. TCTI and OAG, however, were not merged into Macmillan; OAG had its own headquarters in Chicago. Shaffer was replaced as president of OAG, although he remained on the boards of directors of both TCTI and OAG.

## E. *Aboff's Transfer to the Private Side*

As Shaffer's influence grew, he sought to limit Aboff's. Believing that Aboff was not a capable senior manager and perhaps recognizing that the Maxwells were unlikely to simply cut Aboff loose, Shaffer sought, ultimately successfully, to remove Aboff from his role at Macmillan. To this end, Shaffer began negotiating with Kevin Maxwell either to discharge Aboff or move him into an arena other than Macmillan. Shaffer first raised the subject of a severance package for Aboff in late 1989.

That same month the private side formed a travel agency partnership with David and Linda Paresky, owners of Crimson & Heritage Travel, Inc. The Maxwell-related partner was TCTI. The new partnership was known as Thomas Cook Partnership ("TCP"). Aboff assumed an increasing role at TCP, looking after the private side's valuable partnership interest.[5] At TCP, Aboff was charged with pursuing potential acquisitions. His title was Vice Chairman Acquisition/Strategy. Ex. UUU.

Effective March 1, 1990, Shaffer was elevated to Macmillan's presidency and acquired responsibility for managing all of the MCC companies located in the United States, including, of course, OAG. That same month, Shaffer resumed, this time in writing, his dialogue with Kevin Maxwell regarding Aboff's future role. Shaffer prepared a memorandum (the "March memorandum") suggesting three options:

- Aboff would be terminated and receive a severance package recognizing his longevity and efforts on behalf of the family and Macmillan.
- Aboff would continue to report to Shaffer but would be transferred to the private

---

5. The gross sales of TCP for 1990 were in excess of $1 billion.

side, working out of a Greenwich office. He would be assigned responsibility for TCP and private side taxes, as well as any other matter the Maxwells wished to have handled on the private side. He would receive a salary, participate in a profit sharing plan, and receive a significant bonus if the Maxwells exited the travel business. He would continue to draw services from the Third Avenue office staff as needed (legal, analytical, personnel, etc.).

- Aboff would remain in the Third Avenue offices and be assigned a "special project" responsibility in addition to his other private side duties. Special projects might include: setting up an internal audit department and a centralized purchasing function for all operations, as well as handling some real estate matters.

At the end of his memorandum, Shaffer indicated that he would be willing to live with all three alternatives, but urged adoption of the second.

Rumors abounded that Aboff was "out of Macmillan," leading Aboff to discuss his future with Kevin Maxwell. Aboff's notes tell us that Kevin informed Aboff at a meeting held on March 27, 1990, that he was out of "Max/Mac." R. 994–95, Ex. 74. Two days later, Aboff met with Shaffer, who confirmed that Aboff was to depart from Macmillan. Shaffer and Aboff discussed to whom responsibility would be assigned for the individual companies within the Electronic Publishing Group. Aboff's notes dated March 29—under the heading "When do we divide up my group?"—evidence Aboff's knowledge that he would be relinquishing any responsibilities for those companies. The Electronic Publishing Group was disbanded in April 1990 and integrated into other divisions at Macmillan and elsewhere.

Shortly after these conversations, Aboff moved to the West Putnam offices, the former MCC, N.A. offices, which became PH(US)I headquarters; a TCP office was also located there. In a witness statement given to the City of London Police on June 4, 1993, Aboff swore that "apart from the odd special acquisition or disposal, [he] was in-

volved with TCP on a full time basis." Ex. EEE ¶ 30; R. 937. Similarly, in an affidavit earlier submitted to the High Court of Justice in England, Aboff had sworn that "From the time when I started working for Thomas Cook Partnership in 1990 most of my work was for that partnership with very little involvement on the Macmillan public company side." Ex. GGG ¶ 15; R. 951–52. Aboff suggests that these sworn statements are not inconsistent with his current contention that he was always Macmillan's employee because he regularly worked in excess of a "full time" forty hour work week. Thus, he says, when he swore he was working full-time at TCP, he really meant he was working forty hours for TCP and twenty or more hours on Macmillan special projects. However, twenty or more hours per week is not the temporal equivalent of either an "odd special acquisition or disposal" or "very little involvement." I therefore cannot credit Aboff's attempted reconciliation of his past and current statements.

Aboff points to his special assignments as proof that he perpetually worked at the behest of Macmillan, but the facts lead to just the opposite conclusion. In late 1989 or very early in 1990, Robert Maxwell charged Aboff with the duty to investigate suspected fraud within Macmillan, an assignment which bore the code name "Project Leona." When Aboff was moved to Greenwich in April 1990, Maxwell replaced Aboff with Macmillan's chief financial officer and removed Aboff from the assignment. In other words, consistent with Shaffer's testimony, just at the time that Aboff was transferred to the private side, his work on Project Leona was ended. The second assignment concerned Aboff's participation, in early 1991, on the public side's sale of Pergamon Press and certain of its affiliates and subsidiaries. Aboff was instrumental in this project, coined Project Tokyo, which took approximately three months to accomplish. After the bulk of the transfer in May 1991, Aboff continued to work to sell off the remaining book companies. Aboff's time and expenses working on Project Leona were charged back to the public side, again suggesting that, as Shaffer testified, Aboff had been transferred to the

private side, which was not to be saddled with payment for work he performed primarily for the public side.[6]

Aboff says his continued use of Maxwell Macmillan Group letterhead after he moved to Greenwich shows that he was still a Macmillan employee. But he was responsible for whatever stationery he used. Far more probative are the organizational charts from August 1991 which list twenty some-odd executives at Maxwell Macmillan and show the authorization levels for each of those executives within Macmillan. Aboff appears on neither. In addition, Robert Bogart, Macmillan's director of human resources from June 1990 (two months after Aboff moved to Greenwich) through November 1993, testified that Aboff was not a Macmillan group vice president during Bogart's tenure.[7]

To rebut the inferences flowing from this evidence, Aboff proffers a memorandum from David Paresky circulated among the TCP staff after Aboff moved to Greenwich but well before the employment agreement was executed. The memorandum recites that Aboff will remain a Macmillan employee. Paresky, who was not a Maxwell employee or executive, may simply have been wrong. It also may be that this memorandum was intended for either or both of two other purposes: (i) to quell any concerns that Aboff was brought in to second-guess Paresky and (ii) as a face-saving measure for Aboff, who did not want rumors of his "banishment" from Macmillan to spread. In any event, the memorandum predated entry into the employment agreement. More importantly, the issue is whether Macmillan was intended to be the counterparty to that agreement, not whether Aboff maintained a limited relationship with Macmillan. I conclude from all the evidence which I've just explored that Aboff was transferred out of Macmillan and the public side and into Robert Maxwell Group, plc and the private side.

## F. The Operation of the Empire

Robert Maxwell operated the hundreds of public and private corporations in "groups" according to the different purposes the companies served, regardless of whether or not the companies were public or private side. Certain departments at Macmillan, notably, human resources, real estate and legal, provided services to both public and private side entities. And of course Shaffer himself provided services to TCTI, a private side company. None of these services to the private side was gratuitous, however. Public side employees prepared "charge backs" to bill the time they spent on private side matters. Although Aboff insists now that he always remained a public side employee, contrary to other public side employees, he did not keep records of the time that he worked for the private side. Indeed, he was in charge of reviewing the charge backs to the *private* side to ensure that the private side was not being overcharged.

There were occasional services which Aboff performed for the public side, such as supervising the Macmillan employee in charge of mergers and acquisitions (an area in which Aboff had been very active previously). But, by and large, after he moved to

---

**6.** As further evidence of his supposed continuing employment by Macmillan, Aboff points to two things: (i) his consultation by a member of Macmillan's real estate department and (ii) his furnishing of a performance review for a Macmillan employee whose work was in the area of mergers and acquisitions, one in which Aboff had extensive experience. Neither of these services convinces me that Aboff did not move to the private side. It is hardly surprising that someone with Aboff's history on the public side would be used as a sounding board by a former colleague with whom he had worked closely. Even less remarkable is the fact that Aboff was asked to give a performance review for a Macmillan employee of whom he had particular knowledge. After all, Aboff was still an important figure in the Maxwell empire.

**7.** In September 1990 Aboff became a participant in the long term incentive compensation plan, pursuant to which he was entitled to receive grants of MCC shares and stock options. The following September Bogart wrote to Aboff notifying him of his first grant of stock under this plan. Bogart testified that it was he who compiled the list for the U.S. participants in the plan, who typically were public side employees. Indeed, Bogart testified that Aboff, who was not included on Bogart's list originally but was added in England, was the only U.S. private side employee included within the plan. This long-term compensation plan was not included in Aboff's signed employment agreement.

Greenwich, Aboff's services on the public side were terminated; and where he performed services for the public side they were charged back to that side.

### G. *The Evolution of Aboff's Letter Agreement*

#### 1. *The First Draft*

In mid 1989, Aboff complained to Shaffer that he did not have a written employment agreement. They met in September to discuss the benefits which Aboff was already receiving and those additional ones which had been promised to him by Robert Maxwell. *See* Exs. 69, 70. Early the next year, Robert Maxwell told Aboff and Robert Miranda, the president of Pergamon Press, that they would be receiving employment agreements and would be provided with pension and retirement benefits for life. Maxwell instructed them to discuss with Kevin how to structure retirement benefit packages.

As mentioned earlier, Shaffer was dissatisfied with Aboff's operating capabilities and was contemplating a transfer of Aboff to the private side. Shaffer may also have been responding to "new" senior management's resentment that Aboff had the ears of Robert and Kevin Maxwell and did not have to go through "channels." In any event, Shaffer sent Kevin the March memorandum with its three proposed alternatives. After conversations with the Maxwells regarding this memorandum and Aboff's contemplated employment agreement, shortly after Aboff moved to Greenwich Shaffer directed the Macmillan Human Resource Department to prepare a draft employment agreement for Aboff, which it did on April 17, 1990. Ex. 85 ("the April 17 draft"). This draft, prepared on David Shaffer's Macmillan letterhead, provided in relevant part that:

> You will continue as an employee of the Maxmillan/Macmillan Group,[8] ("the Company") paid from Official Airlines Guides ("OAG") while the full-time services that you will provide will be performed on behalf of TCP and will include services which are consistent with your background and experience. You will be responsible for overseeing our interest in TCP and have accountability for our input into the partnership. It will be up to you to assure that the direction of the business reflects the interests of the Maxwell organization. You will also have responsibility for private company taxes, and other duties as may be assigned to you from time to time....
>
> * * * * * *
>
> You will continue to participate in an annual bonus plan having the same provisions as the Macmillan Executive Incentive Compensation Plan ("EICP") for key executives....
>
> In addition to the Incentive Compensation Plan discussed above, we are recommending to the Trustees that you become an eligible participant in the Long Term Incentive Compensation Plan currently being established by the Company....
>
> In addition, you and I have discussed the possibility of an added incentive compensation component in the event that a decision is made to sell or dispose of our interest in TCP....
>
> You will also continue to participate in the employee benefit plans customarily made available to Executive employees of the Company.
>
> * * * * * *
>
> All references to the Company, OAG, or TCP include subsidiaries and affiliates.
>
> * * * * * *
>
> Sincerely yours,
> David H. Shaffer

Agreed:

_____

Sheldon J. Aboff (date)

The following day, Aboff met with Shaffer to discuss certain aspects of the draft which disturbed him. Shaffer instructed Aboff to negotiate with Kevin.

It is necessary to digress from the chronology just a little to explain why OAG appears

---

**8.** Remember that "Maxwell/Macmillan Group" included those private side companies over which Shaffer had authority.

in the April 17 draft. As mentioned earlier, on October 5, 1989, Aboff had requested that he be placed on the OAG payroll retroactive to January 1, 1989, because OAG's benefits were better than those of any other company owned and controlled by Robert Maxwell. Prior to that time, Aboff had not been on Macmillan's payroll, and in fact, Aboff was never on Macmillan's payroll. So the naming of OAG as the entity to pay Aboff's salary was consistent with the prior course of conduct.

Shaffer testified that OAG acted only as paying agent and that the payroll was charged back to the appropriate company. *See also* Ex. UU. Although Aboff does not dispute that he did not perform any services for OAG, he contends that TCP operated functionally as a subsidiary of OAG even though it was not a legal subsidiary. (In fact, TCP was private side while OAG was public side.) It is not necessary to chronicle all of the facts to which he alludes because they demonstrate only that there was a limited symbiosis between TCP and OAG, two travel-related companies, not that TCP operated as a subsidiary of OAG.

Shaffer, who was formerly president and then chairman of the board of OAG, testified that TCP did not support OAG. Aside from the tangential benefits which the companies derived from one another, the companies were not linked. And Aboff does not dispute that he did not work for OAG. Thus I conclude that Shaffer was truthful when he testified that OAG functioned only as a paying agent and was not Aboff's employer.

### 2. The Aird & Berlis Drafts

We return to the chronology. A few days after Aboff received the April 17 draft from Shaffer, he faxed it to Jay Lefton, Esq. of the Canadian law firm Aird & Berlis. Lefton responded on May 11, 1990, by faxing a draft employment agreement to Aboff which Lefton had prepared. Among other things, this five page draft provides,

> Dear Shelly,
>
> The following will serve as our understanding regarding your assignment as Vice Chairman of Thomas Cook Partnership ("TCP"). Maxwell Travel ____, a ____ of ____, currently owns [all of the outstanding shares of] [Thomas Cook Travel Inc.], which in turn owns 50% of TCP. I expect that this assignment will be for a minimum of three years, during which you will be based in TCP's Greenwich office. [*Note*: do we want to provide that you do not have to relocate?] Unless previously terminated, your employment will be automatically renewed. You will continue as an employee of the Maxwell/Macmillan Group (the "Group"), a division of Macmillan, Inc. (the "Company"), which will be responsible for your compensation payments from Official Airline Guides [Inc.] [Ltd.] ("OAG"), although the full-time services that you will provide will be performed on behalf of TCP and will include services which are consistent with your background and experience....

Ex. FF (Draft: May 11, 1990) (brackets in original). After Aboff commented on this draft, Lefton replied with a red-lined version dated May 18, 1990, which he faxed to Aboff. Notably, the language that Aboff was to "continue as an employee of the Maxwell/Macmillan Group (the "Group"), a division of Macmillan, Inc." was removed and replaced by: "You will (continue as) (*be*) an employee of Official Airline Guides, Inc., although the full time services that you will provide will be performed on behalf of TCP...." Ex. JJ. It also contained references to benefits comparable to those provided by Macmillan:

> You will continue to participate in an annual bonus plan on the terms and conditions set out in Schedule ____ hereto, which are the same provisions as the Macmillan Executive Incentive Compensation Plan for key executives....
>
> You will also be entitled to participate in a capital accumulation plan....
>
> You will continue to participate in the employee benefits and benefit plans customarily made available to Senior Executives of Macmillan, Inc. and shall be entitled to participate in such benefits and plans on terms no less favourable to you than you are currently receiving, ...

In addition, you shall be entitled to receive an incentive compensation component in the event that [the Group] [Pergamon Holdings, [Ltd.]] directly or indirectly, sells some or all of its interests in TCP during the term of your employment, including a sale of some or all of Maxwell Travel, Inc. (which owns all of TCTI) or TCTI (which owns 50% of TCP). [**Note: does OAG fit into the chain?**] In the event of such a sale. OAG will pay you five percent of the [gross] proceeds of such sale, . . .

\* \* \* \* \* \*

All references to the Company, OAG, or TCP include subsidiaries and affiliates. Ex. JJ (Draft: May 18, 1990) (brackets and bolding appear in original but red-lining has been omitted). Lefton provided for signature by Kevin Maxwell, yet indicated his own uncertainty by asking the following questions: "Signing on what letterhead on behalf of what company? Do you want a fall-back if OAG does not pay?" Ex. JJ (Draft: May 18, 1990); Ex. HH, II.

### 3. *The Whitman & Ransom Drafts*

The next significant event in the negotiations occurred in the summer of 1990 when Kevin Maxwell asked Ellis Freedman of Whitman & Ransom, Macmillan's outside counsel, to assist in the negotiations. Macmillan also engaged outside pension consultants to help structure Aboff's benefits. Aboff met with Freedman in July 1990 and gave him a copy of the April 17 draft, Aboff's marked draft, David Shaffer's own employment agreement, and notes Aboff had taken during conversations he had had with Kevin Maxwell and Shaffer.

Whitman & Ransom prepared several versions of Aboff's employment agreement between August and November 1990. Freedman marked up Shaffer's nineteen-page agreement to reflect that Aboff's would be modeled after it. *See* Ex. 89. But in August, Robert Maxwell refused to execute the proposed agreement because of its complexity and length; he insisted that there be an informal letter agreement. So Aboff, Kevin Maxwell, and Freedman met in New York to discuss a simpler version.

On August 21, 1990, David Morse, a specialist in the area of employment contracts at Whitman & Ransom, prepared a term sheet ("the Morse term sheet"), which denominates Aboff vice chairman of TCP. *See* Ex. 90. The exhibit submitted into evidence contains notations made by Aboff on the Morse term sheet. Significantly, Aboff crossed out each and every reference to Macmillan. For example, where the Morse term sheet had said that Aboff would have, "Primary Management and oversight authority for Maxwell Macmillan Group's interest in TCP," Aboff's notations on the document change it to read that he would have that authority over the "Maxwell Group" interest, eliminating Macmillan's name from the reference. Where it said that Aboff would participate in "Macmillan's Capital Accumulation Plan," Aboff struck Macmillan and wrote in the word "a"; and where the term sheet said Aboff was to "Continue to participate in Macmillan's Executive Incentive Compensation Plan," Aboff crossed out "Macmillan's." The "Responsibilities" section provided that Aboff was to remain an OAG employee although his full-time services would be performed with respect to TCP. Aboff wrote to the left of "Responsibilities" "1) Private Side Companies." The term of the employment was to begin "Jan. 1 or April 1, 1990." Above the signature line delineated for "Kevin Maxwell" there were five question marks typed in. Morse testified that there were discussions about which company would be the signatory on the contract.

Morse's notes of a meeting regarding the employment agreement reflect that the document was to be a short letter agreement and the signatory was to be "Pergamon Holding (U.K.?) on behalf of all U.S. affiliated companies." Ex. 78. Aboff would be "Responsible for private side, including private side taxes." *Id.* Morse prepared approximately three more drafts. Ex. L (Draft: Oct. 3, 1990); Ex. M (Draft: Oct. 8, 1990); and Ex. O (Draft: Nov. 13, 1990).

Exhibit L nowhere mentions Macmillan; the only reference is to TCP and the "Maxwell Group." As drafted, the proposed agreement, which is to be effective April 1,

1990, names OAG as the provider of all the benefits or perquisites, but that provision is crossed out on the exhibit. A few days later, many of the handwritten emendations reflected on exhibit L were inserted into exhibit M, except that OAG still appears as the provider of all the benefits "unless another member of the Maxwell Group makes such payment. . . ." Exs. L; M.

On November 13, 1990, Morse sent to Aboff Exhibit O, his third draft of the proposed agreement. As with the earlier drafts, there is no mention of Macmillan. This draft provides in pertinent part:

Dear Shelly,

This is our agreement regarding your employment as Vice Chairman of Thomas Cook Partnership ("TCP"), from _____ 1990 to _____ 1993. The term shall be automatically renewed from year to year, unless terminated by written notice at least three months before the end of the then current term.

You will be based in TCP's Greenwich office and will report directly to Robert Maxwell, David Shaffer and myself. You will be an employee of Official Airline Guides, Inc. and will be responsible for overseeing the Maxwell Group's interests in TCP, the private side companies, and their tax matters and such other senior management duties as may be assigned to you. The Maxwell Group shall provide sufficient financial resources, staff and other support to promote the growth of TCP and to enable you to perform your duties.

\* \* \* \* \* \*

Best regards

Kevin F.H. Maxwell

—————

Date

Ex. O (Draft: Nov. 13, 1990). Exhibit O was the last draft to be prepared by the Whitman & Ransom firm. Aboff gave this draft to his secretary, Barbara Tilley, who retyped it on her computer.

### 4. The Final Agreement

After several meetings, Aboff and Kevin Maxwell ironed out the remaining open issues. At some point Tilley printed the final agreement which Kevin and Aboff signed.[9] The agreement provides in pertinent part:

Dear Shelly:

This is our agreement regarding your employment as Vice Chairman of Thomas Cook Partnership ("TCP"). The initial term shall run through December 31, 1993, with automatic renewal for three year terms unless terminated by written notice at least six months before the end of the then current term.

You will be based in TCP's Greenwich office and will report directly to Robert Maxwell, David Shaffer and myself. You will be an employee of Official Airline Guides, Inc. and will be responsible for overseeing the Maxwell Group's interest in TCP, the private side companies, and their tax matters and such other senior management duties as may be assigned to you. The Maxwell Group shall provide sufficient financial resources, staff and other support to promote the growth of TCP and to enable you to perform your duties.

\* \* \* \* \* \*

Best Regards
/s/K. Maxwell
Kevin F.H. Maxwell
4/1/90 —————

Agreed
Date

---

**9.** Whereas Aboff and Tilley testified at trial, at odds with their deposition testimony, that the agreement was signed in February 1991, an interoffice memorandum admitted as exhibit VVV strongly suggests that by May 29, 1991, Aboff's agreement had yet to be signed.

No original of the signed agreement has ever been located. Although the debtors suggest that the photocopy which Aboff produced is a fabrica-

tion, they have not convinced me that they are correct. Certainly there is conflicting testimony about when the agreement was signed and what happened to the original. But at worst, I believe, if there was any fabrication it was that the text was photocopied onto Macmillan letterhead. (That, however, is pure supposition.) But as I commented in the very beginning of this decision, I attach no weight to the fact that Macmillan letterhead was utilized. *See* page 390, *infra.*

/s/Sheldon J. Aboff
Sheldon J. Aboff

Ex. 40.

### a. *The Letterhead*

Although the agreement is printed on Macmillan letterhead, there is no mention of Macmillan in the text. Aboff points to five other employment agreements on the same letterhead, which does not identify a particular officer at Macmillan, and asks me to extrapolate from this that his agreement was therefore with Macmillan. A sixth letter agreement is not on any letterhead. But in five of the agreements which he has proffered, the employees are identified as officers of Macmillan and in each of the other employment agreements, the text identifies the employee's duties at "Macmillan." All six of these agreements also list "Macmillan, Inc." above Kevin Maxwell's signature. *See* Exs. 46, 50, 57, 59, 60 and 64.

There is another letter agreement which is also not on any letterhead but identifies the employee's position as the president and chief operating officer of Macmillan and provides that he will serve as a director of both Macmillan and MCC. Kevin Maxwell signed this agreement twice, once in his capacity at Macmillan and then in his capacity at MCC, N.A.

Perhaps recognizing that there are striking distinctions between all these agreements and his own, Aboff points to Robert Miranda's employment agreement, which lists no entity under Kevin Maxwell's name. However, Miranda's agreement describes Miranda as an employee of Macmillan, and provides that Miranda is to perform full-time services for Macmillan. Ex. 169. The letter was also copied to Shaffer, Macmillan's president, Robert Bogart, vice president of human resources, and Ronald Dunn.

Aboff also relies upon David Shaffer's revised compensation agreement, which does not name Macmillan under Kevin Maxwell's signature. Ex. 51; *cf.* Ex. 89 (Shaffer's executed original employment agreement with OAG indicates that OAG's obligations were unconditionally guaranteed by MCC, N.A.); Ex. 177 (Shaffer's agreement once again restated, this time with Macmillan, has Macmillan's name appearing above Kevin Maxwell's). However, unlike Aboff's agreement, which makes no mention of Macmillan in the text, Shaffer's revised compensation agreement is on "Maxwell Macmillan Group" letterhead, identifies Robert B. Bogart as "Vice President of Human Resources and Administration," and expressly says in the text that David Shaffer was named president of "Maxwell Macmillan" effective March 1, 1990. Ex. 51. Moreover, exhibit 51 is only a revision of Shaffer's nineteen-page agreement reflected in exhibit 89. And not only Kevin Maxwell, but Robert Bogart, signed Shaffer's employment agreement and provided that it was subject to "any approvals required by the Board or Shareholders." Ex. 51.

In other words, unlike every other person's employment agreement that Aboff submits in support of his claim, the only place where the name Macmillan is mentioned in Aboff's agreement is on the letterhead. Ex. 40. How that letterhead came to be used is significant. At trial, Aboff said that he told Tilley to use Macmillan letterhead because Kevin Maxwell so instructed him. At his deposition, however, Aboff had testified that he did not recall Kevin saying any such thing. Tilley told a different story—that she printed the document on Macmillan's stationary because she had a standing order to use Macmillan's stationary whenever one of the Maxwells was to sign something. I do not believe Aboff's self-serving "recollection" of what Kevin had told him; it does not comport with what Tilley said nor with his much earlier deposition testimony (taken only one and half years after the document was allegedly signed rather than five years later, at trial). The more credible explanation was what Tilley explained at trial, that she made the decision to use Macmillan letterhead because she always used Macmillan letterhead for both of the Maxwells. Accordingly, I attach no weight to the printing of the agreement on Macmillan letterhead.

### b. *Use of the Term "Maxwell Group"*

Aboff testified that "Robert Maxwell Group" was the private side entity ultimately owning TCTI. Although the record does not reveal precisely what "Maxwell Group"

means, it is clear that the term did not include Macmillan. Whenever Macmillan was intended to be included within a larger group, its name was utilized, such as with "Maxwell Macmillan Group" or simply "Maxwell Macmillan." This finding is buttressed by Aboff's own deletions of the word "Macmillan" in references to "Maxwell Macmillan Group" on drafts of his employment agreement in addition to his deletion of Macmillan's name every other place it appeared on the drafts. Deletion of "Macmillan" from the phrase "Maxwell Macmillan Group" was obviously meant to exclude Macmillan from the diverse group denominated. The most likely explanation for the term "Maxwell Group" in the letter agreement is that it refers to Robert Maxwell Group, plc, which was the entity with the ownership stake in TCP. This construction comports with the second paragraph of the letter agreement, which refers to Aboff's oversight of "the Maxwell Group's interest in TCP" and obligates the "Maxwell Group [to] ... provide sufficient financial resources, staff and other support to promote the growth of TCP...."

### c. Effective Date

Aboff's final, signed agreement is dated "4-1-90," a date which Aboff describes as January 4, 1990, under the English convention for dates. If, however, the effective date was meant to be April 1, 1990, in accordance with American usage, that would add further support to David Shaffer's testimony regarding implementation of his second alternative for what to do with Aboff, that is, move him to the private side. The significance of April 1, 1990, is that that was the day that Aboff was moved out of Macmillan's offices and

into TCP's offices in Greenwich. It therefore makes good sense that the employment agreement would be executed as of that date, defining Aboff's future with the Maxwells' private companies.

Aboff concedes that January 4, 1990, a random Thursday, has no particular significance. Nonetheless he testified, disingenuously I believe, that he and Kevin intended his agreement to become effective on that date. Aside from his testimony, he offers nothing in support. On the other hand, the debtors point to Aboff's own handwritten notes on the Morse term sheet (discussed earlier) which suggest that the contemplated date was to be "Jan 1 or April 1, 1990." In addition, Morse's draft agreements, admitted as exhibits M and N, include the April 1, 1990, date within the text. Moreover, all the other persons' employment agreements that were submitted use the American method of dating. As will be discussed next, Aboff has already proven himself capable of falsification. I do not credit his testimony that the agreement was intended to be effective as of January 4, 1990.

### H. Aboff's Notes

Evidence of the intent of the parties to the ultimate agreement comes not only from testimony, prior drafts of the agreement, negotiations respecting those drafts, and other contracts executed on behalf of Macmillan, but may also be gleaned from Aboff's contemporaneous notes of meetings with Kevin Maxwell and David Shaffer. Written in his own hand, Aboff's notes include the following:

# 1. (Exhibits 74, 130, JJJ)

*Supp. Personal* MAR 27 1990

1) Job Definition - - - - - a. Confirm, i'm out of Max, Mac [politics][10]
 b. Define "private taxes" — compliance etc
 c. Private companies

2) _?% of book_ – a. Remove etc. 2) Equity – on earnings
 b. ?% of total ▼ 3) phantom stock
 ?% over $40 M

3) _Prior commitments_ – a. Life ins. c. Disability
 b. Retirement

4) Current comp. pkg

5) Pension
 benefit

6) what happens after Book is sold – [_return to Macmillan_][11]

7) what if it isn't sold?

---

**10.** The word "politics" was added sometime after July 25, 1990. This conclusion flows because we know that Aboff sent his unedited notes, that is, without the bracketed words, to the Whitman & Ransom firm by facsimile transmission on July 25. As will be discussed, Aboff tried to palm off the edited notes as the original, contemporaneous notes which he took during the discussions which occurred on the dates which the notes bear.

**11.** The "return to Macmillan" language was added sometime after July 25, 1990.

#2. Aboff typically headed his·notes with the name of the person with whom he was to meet:

Exs. 74, 56, 130, JJJ.

**12.** This item was added sometime after July 25, 1990.

**13.** This item was added sometime after July 25, 1990.

**394**

#3.

---

| | |
|---|---|
| **DHS** | MAR 29 1990 |

1) *When do I see my contract*

2) *Bob got a call from Susan*
 *who hasn't heard from __ wal*
 *was awaiting instructions from us*

3) *When do I divide up my group?*

 **BBI** - *Rick E.*
 **MDMI** - *Frank*
 **MDL** - *Ron*
 **MDML** - *Hickson !!*
 *Special Project* -
 **BRS** *settlement* --
 **MDL** *capitalization* --
 *Sizzle* - *Sussen* -
 *Proc* - *Shaffer / Dunn*
 **UMI** - *contract*

4) *Greenwich office* -- *Tony wants all of it*

---

Ex. CCC.

# 4. Although undated, these notes were written by Aboff at a meeting with David Shaffer after Aboff had received the April 17 draft.

---

1) *Title* --
2) *Duration of assignment* -- *3 years.*
3) *Location of my office*
4) *Who is legal entity.*
5) *First I is very loosey gooses* -
6) *My level of authority in order to "assume" control* *Propose*
7) *conflicts of interest re:* **OAG/TCP**
8) *Annual review* -- *O.X.*
9) *My continuing role in Max/Mac* **O** [*available for special projects--*][14]
10) *3-5 year goals established now? Fair value Era past 5%*
11) *What if you don't allow me to reach the goals .*
12) *stock grants/etc. year vesting*
*13) 5% !! __ U.S. --*
14) *Proc - Dumb Dumb Dumb Dumb - Indexed terms*
15) *specifics of benefits* ----*no specifics on life insurance* -
16) *what if it isn't sold?*
17) *Health insurance on termination*
18) *CAUSE* – **CONFIDENTIALITY NOT ACCEPTABLE**
19) *Disability* -

---

Exs. 74, 130, JJJ.

14. The "available for special projects—" language was added sometime after July 25, 1990.

Before meetings, Aboff would list those items he wanted to discuss, and, at the meeting, would jot down additional notes on the same page; he also updated his notes at subsequent meetings. Generally, Aboff's notes were in blue or black ink and were updated with different colored pens. Aboff explained that he used different colored notes to indicate updating and to highlight where follow-up was necessary. *See, e.g.,* Exs. 88, 130. Aboff also used an ellipse, which appears on the notes above as "O," to indicate that an item was "open" and therefore being discussed.

During discovery, Aboff asserted that his notes were taken contemporaneously at meetings with Kevin Maxwell and reflected that the letter agreement was intended to be with Macmillan or OAG, rather than with the private side. The debtors contend that Aboff tampered with those notes shown above as Nos. 1, 2 and 4 to add substance to his assertion that Kevin Maxwell intended to bind Macmillan and OAG to Aboff's contract.

Although it is not clear from the black and white versions replicated above, some of the additions to the notes were made in green ink. On No. 4: the "–3 years." which appears at item two; the underlining which appears on items six, seven, and nine; the word Proposal at item six; the *"Fair value 3rd past 5%"* which appears at item ten; and the "O available for special projects—" language were all added in green.

Aboff had transmitted facsimile reproductions of the original version of all these notes to the Whitman & Ransom law firm on July 25, 1990, in connection with the firm's assistance in drafting his agreement. Sometime later, he amended No. 4 to include the phrase "available for special projects—." Notably, this change appears in nearly the identical green-colored pen as "O" and the other pre-July 25 amendments discussed above. *See* No. 4. The debtors point to the closed gap on the "O" to indicate where Aboff chose the spot to "match the pens." *Compare* Ex. JJJ *with* Ex. 74.

On No. 2, Aboff also added items "F" and "6" sometime after July 25, 1990. However, on this page of notes, Aboff used black ink—the same color as the original notes. Yet other pre-July 25 amendments appear on that same page in green, specifically, the *"Proposal for Acq team"* language at item five and the underlining which appears in that same item under *"NFO."* The strong implication is that the inclusion in black ink of the added terms "F) Support *OAG* " and "6) Available for Macmillan/Maxwell group special assignments/projects" was an attempt by Aboff to create the illusion that these additions were actually part of the original list of items to be discussed even though the emendations were actually made nearly four months later.

On No. 1, Aboff added the word "politics" to his job definition where it previously had said "Confirm I'm out of Max/Mac." He also added the words "Return to Macmillan" to item six where it had previously asked only "what happens after Cook is sold." These changes too were made after July 25, 1990, four months after the original meeting. Aboff testified that he kept his notes in a personal folder; every time he remembered to bring the folder to a meeting he therefore had the notes of preceding meetings. The notes do show a chronology. It is thus theoretically possible that Aboff had all three sets of notes at subsequent meetings and that he used different colored pens to make his amendments. I do not believe that that is what occurred, however. There is considerable circumstantial evidence which points to a single conclusion, that Aboff fraudulently altered his notes to induce the debtors—and me—to believe that his contract was with Macmillan and OAG. Aboff did not change the notes in the course of meetings with Kevin Maxwell.

All of the post-July 25 alterations significantly change the meaning of what Aboff noted, from a likely cessation of any role with Macmillan to the establishment of a continuing one. And all of the post-July 25 changes added only references to Macmillan or OAG, the critical parties for our purposes, and affected no other terms on the notes. The

post-July 25 additions of items "F" and "6" on No. 2 were written in *black,* seemingly like all the other original items on that page. This is in contrast to the post-July 25 addition of the words: "available for special projects" language which was added in *green,* the same color as the other additions on that page. In addition, earlier amendments to the notes were consistent with the original content.[15] Perhaps most noteworthy is the post-July 25 addition of the word "politics" to No. 1. By July 25, 1990 (a time when the word "politics" did *not* appear on the notes), Aboff no longer worked out of Macmillan's Third Avenue offices, no longer attended senior staff meetings, and no longer received any senior executive Macmillan correspondence. At his deposition, Aboff had testified that the reason he was moved to Connecticut was to remove him from Macmillan's "politics," rather than its employ, and his contemporaneous notes were supposed to add substance to that point. However, the debtors later discovered that the word "politics" was added at some point after July 25, 1990, long after Aboff left the Third Avenue offices. Since no one from Macmillan worked at TCP, now, after his original version of his notes has come to light, Aboff concedes that it is senseless to argue that after July 25, 1990, Macmillan's politics were any longer a concern to him. Rather he incredibly suggests that perhaps he wrote those words in a later discussion reflecting that he was then already out of Max/Mac politics. If the issue were debated whether or not Aboff was going to be out of Max/Mac "politics" or Max/Mac itself, logic suggests that it would have occurred prior to the time Aboff moved away from those politics in April 1990. And Aboff's notes given to Whitman & Ransom in July would have reflected the addition of the word "politics."

Significantly, during discovery Aboff produced to the debtors only black and white copies of his notes. He did not explain to the debtors that not all entries on the black and white photocopies were contemporaneous with the meeting he was describing. Neither did he tell the debtors that copies of the notes as originally written were sent to Whitman & Ransom.[16] Surely Aboff understood during his deposition that black and white copies of his notes were misleading. Yet he neglected to mention anything about his practices either of updating notes or of using colored pens to reflect different things.

In addition to all these others matters, Aboff misrepresented to the debtors at his deposition that those notes which I have called No. 1 were taken at a meeting with Kevin Maxwell held on March 27, 1990. Indeed he volunteered that he specifically recalled that the "Support *OAG*" language on No. 2 above was written *at* the March 27 meeting with Kevin Maxwell. He also said that, as he recalled, all the notes were taken on the same day. The falsity of these statements is categorically proven by the Whitman & Ransom version of the notes which, again, were transmitted to the law firm in July. At trial, Aboff admitted that his deposition testimony was false.

From all this, I conclude that Aboff deliberately altered the most critical evidence in his case and lied at his deposition about when the notes were taken.

### I. *Aboff's Claim to Employment by OAG*

Aboff's employment agreement contained a provision entitling him to participation in a capital accumulation plan and a bonus. Ex. 40 ¶ 5 at 1. In May 1991, Glen Markowski, the General Manager of Financial Services at OAG, issued a bonus check to Aboff on which it was indicated that Aboff was "GRPVPX." Pl.'s Ex. 107. Markowski indicated that he was issuing the check pursuant to Robert Bogart's request. Aboff contends that this

---

15. For example, as I mentioned above, on No. 2 amendments were added in green; the addition of the notes to include the phrase "Proposal for Acq team," which was added before July 25, 1990, in green, does not change the original meaning of the notes.

16. The debtors learned of the alteration of the notes when Whitman & Ransom, after it had already complied with the debtors' document demand, found another file containing the notes and supplemented its document production. Aboff does not contend that there was any violation of his attorney client privilege because he says that Whitman & Ransom were not his counsel, but counsel for Macmillan, whom Macmillan consulted on Aboff's behalf.

payment constituted OAG's acknowledgment of its liability under the employment agreement.

There is another, more plausible, explanation, however. TCTI and TCP did not have their own payroll, and Shaffer testified that expenses incurred by the public side for private side matters were charged back to the private side. In the six months prior to May 1991 (the month when Aboff received his bonus check), approximately $25,000 per month was charged back to the private side by OAG. Yet in May, $224,572.95 of TCTI expenses incurred by OAG were charged back. Ex. UU. These numbers strongly suggest that Aboff's entire bonus was charged back to the private side, consistent with Shaffer's testimony that he directed that Aboff's bonus be charged back to TCTI. This is also consistent with my conclusion, expressed earlier, that OAG was only a paying agent for Aboff, and not his employer.

### J. Events Just Preceding Aboff's Resignation from the Public Side

#### 1. The Increasing Debt owed by the Private to the Public Side

After the MCC accounts were closed for June 1991, Basil Brookes, the Finance Director of MCC, discovered that the intercompany balance owing to the public side from the private side was substantial, approximating £178 million. Ex. 172, Shaffer's Statement to the City of London Police 13 (Sept. 16, 1992). Brookes approached Robert Maxwell, who mollified Brookes with an assurance that the situation would be rectified by July. Instead, the July balance increased to approximately £300 million. Brookes called an early August emergency meeting of the board of directors of MCC. *Id.* at 14. When Robert Maxwell unilaterally canceled the meeting, Brookes met privately with three directors of MCC, including Shaffer, to voice concern. They formed a subcommittee to monitor the public-private transfers and established procedures and guidelines for future MCC management.

By mid-October, although the procedures and guidelines for the transfer of funds between the public and private sides had been formulated by the independent members of MCC's board of directors, the necessary board resolutions to enact these changes had not been passed. Brookes resigned or threatened to resign.

#### 2. The Misappropriation of Macmillan and Pergamon Holdings Corp. Monies

The debtors charge Aboff with the responsibility for the misappropriation of several million dollars in tax refunds by PH(US)I from Pergamon Holdings Corp. The refund checks were deposited into PH(US)I's account. Aboff was president and one of three directors of PH(US)I, the other two of whom were Robert Lefko and Steve Denbaum. Exs. H, EEE, GGG, KKK. All three had check-signing authority over PH(US)I's account with Chemical Bank. Ex. H. The account required two officers to sign for transfers out in excess of $5,000. PH(US)I's offices were located at West Putnam Avenue and housed essentially five employees, Aboff, Murtha, Tilley, Denbaum, and one Doug Robinson. Tilley and Murtha reported directly to Aboff and were under his supervision. For the most part, Robinson worked on TCP matters. PH(US)I operated as a conduit through which the private side would effectuate mostly intercompany transfers of millions of dollars. Upon the direction of the Maxwells, Aboff, in his capacity as president, would transfer the funds. Aboff testified that he had no knowledge that the transfers were wrongful. He also said that he did not always effectuate the requested transfers— sometimes Lefko and Denbaum did so. R. 1761. During his tenure, Shaffer was also unaware that the transfers were wrongful. He testified that there had always been intercompany balances between the public and private side companies. Ex. 172 at 13. Aboff testified that he had no involvement in the misappropriation and that he did not recognize the handwriting on the deposit slips or the endorsements on the back of the checks. Tilley, who testified that she could recognize Aboff's handwriting (and did so at other instances in the trial), also did not recognize the handwriting on the checks. Aboff said that Murtha and Denbaum were responsible for the bank statements and books and records of PH(US)I; Aboff testi-

fied that he did not maintain them. R. 1748, 1756. Lefko denied participation. So did Aboff.

On October 25, 1991, someone at Macmillan apparently authorized a $500,000 wire transfer to PH(US)I. That same day someone from PH(US)I wired out $1 million. Aboff swore that he did not recognize the Macmillan wire transfer request form associated with the transfer. Not only Aboff but Shaffer testified that Aboff did not have the appropriate authority to wire transfer funds out of Macmillan.

### 3. The Loss of Berlitz Shares

In order to purchase Macmillan and other business assets, MCC had borrowed approximately $3 billion from a syndicate of banks. The terms of the syndicated loan called for repayment of $750 million in October 1992. In the spring of 1991, MCC's board of directors decided to sell off various assets in an attempt to raise the needed $750 million by December 31, 1991 so that Macmillan could retire the loan early and improve its negotiating posture with the banks. The bulk of the $750 million was to come from Macmillan's sale of its majority interest in a publicly held company called Berlitz International, Inc. ("Berlitz"). Ex. 172, Shaffer's Witness Statement to City of London Police, at 4 (Sept. 16, 1992). Toward this end, Shaffer entered into negotiations with a variety of potential purchasers of the stock which culminated in the fall of 1991 with a Japanese company's offer of $265 million.

All along, Shaffer testified, he had thought that Macmillan's shares of Berlitz were under Macmillan's control. After Robert Maxwell's death in November 1991, however, Shaffer was to learn that Shearson Lehman had filed a Schedule 13D which purported to show that it was the beneficial owner of 1.9 million of the shares. Ex. 172 at 5. After some investigation, Kevin Maxwell reported to the MCC board of directors that Robert Maxwell had in fact inappropriately and without authority pledged the Berlitz shares that were in the possession of Shearson Lehman. In addition, it was later discovered that another 2.4 million of Macmillan's Berlitz shares had been pledged to a Swiss Bank. Ex. 172 at 7. The remainder of Macmillan's Berlitz stock was also discovered to have been pledged to several other institutions. Id.

How these pledges occurred is a matter of some dispute. There is documentary evidence which purports to show that in November 1990 a telephonic meeting of the board of directors of Macmillan was convened at which Shaffer was a participant. During this meeting, Macmillan supposedly was authorized to transfer all of its interest in Berlitz, 10.6 million shares, to Bishopsgate Investment Trust, plc (a private side entity) as nominee, with Macmillan remaining the beneficial owner of the shares. Ex. 172 at 7–8 and documents annexed. Shaffer testified that he first discovered this alleged transaction a year later, in November 1991, and did not participate in the documented meeting of Macmillan's board of directors.

Sometime in late October 1991, Aboff and the Maxwells discussed the Maxwell organization's need for cash. Aboff suggested that if shares of a company traded on an American stock exchange could be made available, Aboff would approach brokerage companies and ask them to lend up to 50% of the shares' value on margin. Ex. EEE ¶ 57. Aboff testified that Robert Maxwell told him that the private side had Berlitz shares available which were owned free and unencumbered. Id. Aboff opened an account at PaineWebber in the name of "BIT, c/o PHU-SI" specifically to receive 2.3 million shares of Berlitz stock to be margined for the borrowing. After PaineWebber expressed concerns about using the Berlitz stock as collateral because the number of shares might be too large for the market float, Aboff communicated with two other brokerage firms, Advest and D.H. Blair, with whom Aboff had personal accounts. Ex. EEE. Aboff started with small amounts of Berlitz stock to avoid the concern expressed by PaineWebber.

Over a period of approximately twelve days, Aboff transferred one million Berlitz shares to his personal margin accounts, drew down $4.2 million in his own name and immediately transferred the funds to PH(US)I. Id. ¶ 63. Aboff did not tell the brokerage firms that he did not own the shares. Id.

Once the funds landed at PH(US)I, Aboff used some of the proceeds to buy shares of MCC and Mirror Group Newspapers. Aboff testified that he acted at the behest of the Maxwells, receiving no remuneration for the use of his private accounts nor any written assurances from the Maxwells regarding repayment of the margin loans. Aboff claims that he did not know that the Berlitz shares belonged to Macmillan at the time that he acquired them as nominee and only learned of their true ownership on December 6, 1991. The shares have never been returned to Macmillan.[17] Aboff says that he informed Susan Aldridge, Macmillan's chief financial officer, that he had some of Macmillan's shares. Ex. EEE ¶ 64. Ms. Aldridge, however, did not testify in corroboration of Aboff's testimony. On the other hand, Shaffer testified that as soon as the shares were discovered missing, he engaged in many conversations with Aldridge regarding the issue. On December 12 or 13, after Shaffer had told Aldridge that some of Macmillan's shares were in Aboff's possession, she indicated that she had no previous knowledge of the shares' whereabouts.

Earlier, on December 8, 1991, Shaffer had told Aboff that Macmillan's shares of Berlitz stock were missing. Aboff's notes of the conversation reflect his knowledge that the shares were missing yet he did not disclose to Shaffer that one million of them were in his accounts. *See* Ex. 53. It was not until December 12, 1991, that Aboff instructed his attorney to write to Macmillan's chief counsel, Mr. Bender, and inform Macmillan that he possessed some of Macmillan's missing Berlitz stock.

### 4. The Severance of the Public and Private Sides

As the independent directors of MCC began to suspect the extent to which Robert Maxwell may have defrauded the public companies, they concluded that many of the ties between the public and private companies had to be severed. On December 6, Shaffer informed Aboff that there was to be effectu-ated a total separation of the public and private sides and that the private side employees on OAG's payroll had to move off that payroll. *See* Ex. RRR. Shaffer also intimated that Aboff's employment agreement was being examined to determine whether it was a private or public side obligation.

On December 8, during the conversation about the missing Berlitz shares, Shaffer informed Aboff that it had been determined that his employment agreement was with the private side and was therefore solely a private side obligation. He also said that OAG would no longer pay Aboff's, Tilley's, or Murtha's salaries. On December 9, 1991, Shaffer informed Aboff in writing that all expenses of the private side had to be separated from MCC and its subsidiaries. Ex. 116. Shaffer indicated that Maxwell Macmillan would no longer serve as paying agent for the private side for Aboff's salary and benefits. On December 11, through counsel, Aboff notified Shaffer that Aboff considered himself a public side employee and demanded Macmillan's adherence to the letter agreement. On December 12, Bogart and one Bob Yardis informed Aboff, via internal memoranda, that OAG would cease to act as paying agent for his, Tilley's and Murtha's salaries. Ex. 118, 119. The next day, Robert Baldwin of MCC's human resources department wrote to Aboff informing him that MCC had canceled the standing order under which MCC paid a $45,000 annual consulting fee to Aboff. Ex. 120. On that same day, Susan Doctors of OAG's human resource department informed Aboff that OAG would no longer pay him. She noted further that since Aboff had provided services after the date upon which OAG would cease paying him, he would be entitled to his salary for all days worked from the employer to whom he provided the services. Ex. 121. James Harrington of Maxwell Macmillan's risk management and employee benefits team similarly informed Aboff that Macmillan would no longer provide services to Aboff's company and that

---

**17.** The propriety of the transfers of the Berlitz shares is the subject of a state court action. These facts were adduced by the debtors to establish that even if Macmillan had an otherwise valid employment agreement with Aboff that it was unenforceable because Aboff had breached his fiduciary duty to Macmillan in regard to the Berlitz shares.

OAG would no longer pay his salary. Ex. 122.

Some days later, Robert Maxwell mysteriously disappeared from his yacht and turned up dead. On December 3, 1991, Kevin and another of Robert Maxwell's children, Ian, were asked to resign from MCC's board of directors. Less than two weeks later, on December 16, 1991, MCC filed a voluntary chapter 11 petition in this court followed immediately by a petition to the High Court of Justice in London for an administration order which, under Britain's Insolvency Act 1986, is the closest equivalent in British law to chapter 11 relief. *See In re Maxwell Communication Corp. plc*, 93 F.3d 1036 (2d Cir.1996).

By December 1991, various banks with loans outstanding to the Maxwell companies had entered into a standstill agreement, and transactions affecting the public and private side were being scrutinized. An accounting firm was retained to examine the suspected unlawful goings-on and in this vein made an appointment with Aboff to examine the books and records of PH(US)I. Instead of meeting with the accounting firm as scheduled on December 17, 1991, Aboff, with the assistance of Murtha and Tilley, packed up many of the PH(US)I records and loaded them into his car. At his instruction, nine other bags of documents were shredded. The next day Aboff resigned from Robert Maxwell Group, plc and purported to do the same with respect to Macmillan. Ex. SSS.

## II.

Earlier in these proceedings, both parties moved for summary judgment with respect to the employment contract. The debtors also moved to dismiss Aboff's proofs of claim on grounds that he had tampered with the evidence. Aboff sought summary judgment on the debtors' counterclaims against him, arising out of (i) his margining Macmillan's Berlitz shares on behalf of the private side, and (ii) the PH(US)I cash transfers and receipt of the debtors' misappropriated tax refund checks. *See Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan)*, 186 B.R. 35 (Bankr.S.D.N.Y. 1995). I did not grant summary judgment to Aboff because the letter agreement was ambiguous and the debtors had come forward with sufficient evidence to lead me to question Aboff's veracity. I denied summary judgment to the debtors on evidence tampering grounds because Aboff had produced a sufficiently possible explanation for the emendations to defeat summary judgment. I determined that the Maxwell Macmillan Realization Liquidating Trust, which was created pursuant to MCC's confirmed plan of reorganization, had standing to assert the counterclaims. Upon request, I remanded to the state court the Berlitz-related counterclaims pursuant to 28 U.S.C. § 1334(c)(1). I denied summary judgment on the argument that the counterclaims were time-barred because the dates of the alleged conversions were disputed.

■ At trial, Aboff abandoned the statute of limitations defense. He failed to address the issue in the joint pretrial order, neglected to argue it during the trial, and omitted the issue from his post trial submissions. Indeed, Aboff defended the counterclaims on the merits. The defense is therefore waived. *See Camp, Dresser & McKee, Inc. v. Technical Design Assoc., Inc.*, 937 F.2d 840, 843 (2d Cir.1991); *MEI Int'l v. Schenkers Int'l Forwarders, Inc.*, 807 F.Supp. 979, 989 (S.D.N.Y. 1992).

## III.

### A. *Employment Contracts*

■ To recover for breach of an employment contract, the plaintiff must show "1) the making of an agreement; 2) due performance by the plaintiff; 3) breach of the agreement by the defendant; and 4) resulting damage to the plaintiff." *Palmer v. A. & L. Seamon, Inc.*, No. 94 Civ. 2968, 1995 WL 2131, *1 (S.D.N.Y. Jan. 3, 1995).

■ Authority to bind corporations to employment contracts is not presumed, however, in every contract made by the officers or directors of the corporation. *See* 2 W.M. FLETCHER, FLETCHER CYCLOPEDIA OF CORPORATIONS § 466 at 506 (1988 revised vol. 19, Clark Boardman Callaghan 1991–1994). The burden is upon the plaintiff to show that an

employment contract was either made or ratified by an officer or director having the authority to bind the corporation. 2 FLETCHER, *supra*, § 466.1 at 515; *Goldenberg v. Bartell Broadcasting Corp.*, 47 Misc.2d 105, 108–09, 262 N.Y.S.2d 274, 279 (Sup.Ct.1965). Contracts for lifetime employment have been deemed "unusual" by New York courts faced with claims relating to such contracts. *Burke v. Bevona*, 931 F.2d 998, 1001–02 (2d Cir.1991). Under New York law it is settled that in order to bind a corporation to an "extraordinary" contract entered into between a corporate official and another party, it is necessary to show that the official had the express authority to do so. *Id.* However, what is unusual or ordinary necessarily depends on the circumstances of the particular case. *Id.* The party seeking to enforce the contract bears the burden of showing the existence of authority to sign an extraordinary contract. *Id.*

 Although the debtors question Kevin Maxwell's corporate authority to bind Macmillan, at least three witnesses, one of whom was Macmillan's in-house counsel, confirmed that he had such authority. *See* Testimony of Constantine, R. 59; Testimony of Miranda, R. 173; Testimony of Shaffer, R. 511–513, 1947–1948, Ex. 177. Kevin Maxwell entered into more than one contract providing for lifetime benefits for Macmillan employees and Miranda is continuing to receive benefits under his. Yet Aboff has submitted no evidence that Kevin Maxwell had the express authority to bind OAG to a lifetime employment contract. Plainly, this is an extraordinary contract, permitting Aboff, who was then in his early forties, to immediately retire and receive a lump sum benefit of some $18 million. Aboff contends that since OAG began making payments under the contract, it therefore effectively ratified the agreement. However, there was no ratification because the payments made by OAG were charged back and were contemplated to be charged back from the very beginning; OAG was simply the paying agent. *See Levy v. David C. Gold & Co., Real Estate, Inc.*, 141 A.D.2d 511, 529 N.Y.S.2d 133 (2d Dep't 1988) (an agent for a disclosed principal will not be personally bound to a contract unless there is clear and explicit evidence of the agent's intent to add or substitute its own personal liability for that of its principal); *In re Thomson McKinnon Securities, Inc.*, 149 B.R. 61, 71 (Bankr.S.D.N.Y.1992) (compensation received from subsidiary consistent with terms of employment contract from parent did not make subsidiary assume obligations of employer). There was no evidence that OAG purported or was authorized to ratify another company's obligation. Therefore, I turn to the issue of whether Macmillan was the intended counterparty to this agreement.

### B. *Interpretation of the Contract*

 The construction of corporate contracts, including employment contracts, is governed by the same rules applicable to contracts of individuals. 6 FLETCHER, *supra*, § 2585 at 542–43. "The objective in any question of the interpretation of a written contract, of course, is to determine ... the intention of the parties as derived from the language employed." *Siebel v. McGrady*, 170 A.D.2d 906, 907, 566 N.Y.S.2d 736, 737 (3d Dep't 1991) (quotation omitted). That intent should be viewed from the time the parties executed and entered into the contract, not from hindsight. FLETCHER, *supra*. "The court must ascertain the intent of the parties from the plain meaning of the language employed," *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996) (quoting *Tigue v. Commercial Life Ins. Co.*, 631 N.Y.S.2d 974, 975 (4th Dep't 1995)), giving reasonable, lawful, and effective meaning to all of its provisions. *Id.* (citing *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990)). Definitive, particularized contract language generally takes precedence over expressions of intent that are general, summary or preliminary. FLETCHER, *supra*, § 2585 at 558–559.

 If the language of the contract is unambiguous, its meaning is determined without reference to evidence outside the "four corners" of the agreement; however, if the meaning of the language employed is unclear and the contract ambiguous, extrinsic evidence may be considered. *See PaineWebber*, 81 F.3d at 1199; *Janos v. Peck*, 21 A.D.2d 529, 532–33, 251 N.Y.S.2d 254, 258–59 (1st Dep't), *aff'd*, 15 N.Y.2d 509, 202 N.E.2d 560, 254 N.Y.S.2d 115 (1964). "A term is

ambiguous if it is susceptible to more than one reasonable interpretation." *Lash Corp. v. Fisher Hamilton Scientific, Inc.*, No. 94–CV–767H, 1996 WL 111582, *2 (W.D.N.Y. Jan. 11, 1996); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

■ A court should construe ambiguous language against the interest of the party that drafted it "to protect the party who did not choose the language from an unintended or unfair result." *See PaineWebber*, 81 F.3d at 1199 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, —— U.S. ——, ——, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995)); *Graff v. Billet*, 64 N.Y.2d 899, 902, 477 N.E.2d 212, 213–14, 487 N.Y.S.2d 733, 734–35.

■ The parties spent a great deal of time litigating whether or not Aboff provided services for Macmillan. This type of evidence is relevant as an aid for determining the intent behind the words of an ambiguous contract; it tends to show that the parties intended the contract by virtue of the fact that they performed consistent with it. *See Dow Chemical Co. v. S.S. Giovanella D'Amico*, 297 F.Supp. 699, 706 (S.D.N.Y.1969); *Janos*, 21 A.D.2d at 535, 251 N.Y.S.2d at 261; *Hoffman v. Hoffman*, 212 A.D. 531, 208 N.Y.S. 734, 735 (4th Dep't 1925); 4 WILLISTON ON CONTRACTS § 601 at 306, § 618 at 718 (3d ed.1961); *Rottkamp v. Eger*, 74 Misc.2d 858, 861, 346 N.Y.S.2d 120, 125 (Sup.Ct. Suffolk County 1973). In and of itself, however, whether Aboff provided services to or for Macmillan is not outcome determinative of the objection to his claim. No liability is placed upon a stranger to an agreement, and unless the party intended to be bound by the agreement, it is not liable for its breach. *New York Tel. Co. v. Teichner*, 69 Misc.2d 135, 136, 329 N.Y.S.2d 689, 691 (Sup.Ct. Suffolk County 1972); *American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *appeal denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991); *see also Tigue*, 219 A.D.2d at 821, 631 N.Y.S.2d at 975.[18]

The term "Maxwell Group" is certainly ambiguous. Aboff suggests that I construe this ambiguity against Macmillan and find that Maxwell Group includes Macmillan because it was Macmillan's counsel who drafted the contract embodying the ambiguous term. I disagree. The purpose of the maxim is "to protect the party who did not choose the language from an unintended or unfair result." *PaineWebber*, 81 F.3d at 1199. Here, Aboff contributed to the ambiguity present in the Whitman & Ransom drafts because Aboff personally crossed out every reference to Macmillan at each place it appeared on Morse's term sheet. Contrary to what Aboff suggests now, it was Aboff who provided the term "Maxwell Group" to be used on his employment agreement: in his own hand, Aboff crossed out "Macmillan" from Morse's reference to the "Maxwell Macmillan Group" on exhibit 90, changing it to read "Maxwell Group." Accordingly, if I am to construe the ambiguity against anyone, it is against Aboff. Moreover, the inference that Maxwell Group does not include Macmillan is buttressed by Aboff's crossing out every other reference to Macmillan on the Morse term sheet.

As chronicled in much detail above, the services which Aboff provided to Macmillan after his transfer did not rise to a level remotely suggesting that Macmillan intended to bind itself to a lifetime employment contract. And Aboff's salary, although paid by OAG, was charged back to the private side. As Aboff himself swore under oath, after he moved to the West Putnam offices, he had very little involvement in Macmillan matters. Ex. GGG. He was removed from one of his "special assignments," and for the other, Project Tokyo, to the extent his services benefited the public side, they were charged back to the public side. Contrary to his claim, Aboff was indeed notified of his transfer to the private side. On March 27, 1990, Kevin Maxwell notified Aboff that he would be "out" of Maxwell Macmillan. That instruction is shown to have been implemented by Aboff's dividing up his Electronic Publishing Group responsibilities on March 29, 1990, and by his moving his office to Greenwich and taking on

---

**18.** Quantum meruit recovery is not sought and, in any event, Aboff has not proved the value of

any services which he provided to Macmillan after his transfer to the private side.

the role as group vice president of TCP on April 1, 1990. After he moved to TCP's Greenwich office, Aboff stopped attending Macmillan employee meetings and stopped receiving Macmillan senior executive correspondence.

Aboff's contention that the failure to name Macmillan was a bilateral oversight is disingenuous. He himself ensured that Macmillan's name did not appear on the final drafts. It was no mistake that Macmillan's name did not appear on his final agreement. To bolster the theory of mistake, Aboff testified that it was never contemplated that he was to be out of Macmillan, only that the precise nature of his continuing role was being negotiated. This assertion is untrue. His own notes indicate that one of the terms being negotiated was "who is the legal entity" to be the counterparty to the agreement. *See supra* No. 4. Aboff points to the language, "You will continue as an employee of the Maxwell/Macmillan Group" in Shaffer's original April 17 draft to support his theory that the absence of such language in the final draft was an oversight because, right from the very start, Aboff was to continue as an employee of Macmillan. Cutting the other way, however, is the progression of drafts which show that the identity of the legal entity was very much in debate. *Cf.* Ex. 85 ("You will continue as an employee of the Maxwell/Macmillan Group"); Ex. FF ("You will continue as an employee of the Maxwell/Macmillan Group ("the "Group"), a division of Macmillan, Inc."); Ex. JJ ("You will (continue as) (*be*) an employee of Official Airline Guides, Inc."); Ex. JJ ("Signing on what letterhead on behalf of what company? "); Ex. 90 ("Primary Management and oversight authority for the Maxwell ~~Macmillan~~ Group's interest in TCP"); Ex. 78 ("Pergamon Holding (U.K.?) on behalf of all U.S. affiliated companies"); Ex. L (reference to "Maxwell Group" but no entity above Kevin Maxwell's signature line); Exs. M, N, O, 40 (same). I do not believe that after a year and one-half of negotiations on that very issue, there was a mistake in omitting Macmillan's name above Kevin Maxwell's signature.

Further evidence of the parties' intent comes from Aboff's altered notes. Evidence tampering "goes much further than merely to discredit the [altered] document itself; it is positive evidence upon the very issue [the document is intended to demonstrate], and weighty evidence as well." *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha,* 102 F.2d 450, 453, *modified on other grounds,* 103 F.2d 430, 453 (2d Cir.1939). Aboff's fraudulent amendments diametrically change the meaning of those notes. Therefore, Aboff's actions support the conclusion that the unaltered version of the notes accurately reflected that Aboff was to be "out of Max/Mac," was not to *"return to Macmillan"* nor "support *OAG."* *See Warner Barnes & Co.,* 102 F.2d at 453; *United States v. Philatelic Leasing, Ltd.,* 601 F.Supp. 1554, 1565–66 n. 10 (S.D.N.Y.1985) (quoting 2 John H. Wigmore, *Evidence* § 278 at 133 (James H. Chadbourn rev., 1979)), *aff'd,* 794 F.2d 781 (2d Cir.1986). In addition, Aboff's fraudulent inclusion of the term "available for special projects" leads me to conclude that he knew full well that Shaffer's "second alternative" had been implemented. He added that language in an apparent attempt to fool me into believing that a version of the "third alternative" had been implemented instead because that option specifically referred to "special projects."

That Macmillan engaged outside counsel and a pension consultant to assist in drafting Aboff's agreement is not particularly important. Credible testimony established that Macmillan frequently provided services to the private side. Testimony of Constantine, R. 65. Employees of the Maxwell Macmillan group of companies provided services to both the public and private entities simply because their employer had said to work on an assignment regardless of which entity was paying their salary. *Id.;* Testimony of Bogart, R. 1873; Testimony of Shaffer, R. 531–532; R. 739–40. Moreover, Shaffer's "second alternative"—transferring Aboff—expressly contemplated that he would continue to draw services from employees at Macmillan's Third Avenue offices. The fact that Macmillan's outside counsel and Macmillan's outside pension consultant assisted in the negotiations accordingly does not lead me to con-

clude that Macmillan itself intended to be bound by Aboff's contract.

Similarly, Aboff's participation in Macmillan's long term incentive compensation plan has no independent relevance. The benefit does not appear in Aboff's final agreement. Here, there was a demonstrated effort to burden only the private side with the obligations contained in Aboff's letter agreement and Aboff's participation in Macmillan's long term incentive compensation plan does not affect that conclusion.

### C. Whether the Debtors Are Estopped from Denying Liability

■ Aboff urges that the debtors ought be estopped from denying that they are liable on his contract because the documents that Macmillan sent him in December 1991 prove that Aboff was not terminated until that time. He cites *Leventhal v. New Valley Corp.*, No. 91 Civ. 4238, 1992 WL 15989, * 5 (S.D.N.Y. Jan. 17, 1992) which held, "[i]t is well settled that where a party to a contract terminates the contract and presents a specific reason for the termination, that party is estopped from raising a different reason upon the commencement of the action." In *Leventhal*, the employer had paid the plaintiff in accordance with the agreement for over three years without once suggesting the contract was void for want of consideration or unconscionability. When the employer announced it was discontinuing severance payments, it stated as its reason "severe financial problems." The *Leventhal* court held that the employer was equitably estopped from later objecting to the agreement's validity. *Id.* Aboff argues that he, similarly, was paid all along pursuant to the terms of the contract and then given a reason for his termination in December 1991—re-

cent events necessitating the complete separation of private and public side interests. There are important differences here, however. First, the salary paid to Aboff from OAG was charged back to the appropriate private side company. And the services Aboff performed on Project Tokyo were charged back to the public side. All of the documents sent to Aboff from the various companies did not say that Aboff was being "terminated" for the reason specified, but they affirmed that those companies would no longer be paying his salary and informed him that he would have to seek compensation from the private side employer to whom he was providing services. There is no estoppel here.[19]

### D. Whether Aboff Is Responsible for the PH(US)I Transactions

■ "[O]fficers and directors may not be held liable simply on the basis of their authority...." *American Feeds & Livestock Co., Inc. v. Kalfco, Inc.*, 149 A.D.2d 836, 837, 540 N.Y.S.2d 354, 356 (3d Dep't 1989). "The ordinary doctrine is that a director, merely by reason of his office, is not personally liable for the torts of his corporation; he must be shown to have personally voted for or otherwise participated in them." *Armour & Co. v. Celic*, 294 F.2d 432, 439 (2d Cir.1961).

■ The debtors charge Aboff with conversion and aiding and abetting the Maxwells' asserted conversion, breaches of fiduciary duty, and fraud. In New York, conversion is the "unauthorized exercise of dominion over the property of another to the exclusion of the owner's right, or the unauthorized use of that property." *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 923 F.Supp. 439, 447 (S.D.N.Y.1995) (quoting *City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F.Supp. 1273, 1280

---

**19.** Aboff wonders why the debtors have not produced a document from their files which reflects Aboff's formal transfer to the public side in 1990 when both Shaffer and Bogart testified that in order for Macmillan to have severed Aboff, either termination, resignation, or a transfer would have had to occur. Testimony of Shaffer, R. 475; Testimony of Bogart, R. 1874–1875. Aboff submits an official interoffice communication which was sent out in January of 1992 for some other employee headed "Transfer of Employment" and questions why Macmillan cannot produce a simi-

lar one for his alleged transfer or termination. Ex. 127. Plainly and simply, Aboff has not shown that transfer forms were within Macmillan's corporate procedures at the time that Aboff was transferred. Exhibit 27, dated January 1992, which is subsequent to the separation of the public and private sides necessitated by MCC's insolvency, is irrelevant to the pre-December 1991 time period when Aboff was transferred. Aboff was notified orally of his transfer to the private side on March 27 and again on March 29, 1990.

(E.D.N.Y.1995). Fiduciary duty is an obligation of "utmost good faith, fairness, [and] loyalty." *See Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1078 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). And corporate officers and directors can be held individually liable for fraud if they personally participated in, or had actual knowledge of, the fraud. *People v. Apple Health & Sports Clubs Ltd., Inc.*, 80 N.Y.2d 803, 599 N.E.2d 683, 587 N.Y.S.2d 279, 282 (1992); *People v. American Motor Club, Inc.* 179 A.D.2d 277, 582 N.Y.S.2d 688, 692 (1st Dep't 1992).

 "Personal liability will be imposed [ ] upon corporate officers who commit or participate in the commission of a tort, even if the commission or participation is for the corporation's benefit." *Key Bank v. Grossi*, — A.D.2d —, —, 642 N.Y.S.2d 403, 404 (3d Dep't 1996); *National Survival Game v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y.1985); *Sachs New York, Inc. v. Kin Post Realty Corp.*, 84 Misc.2d 827, 377 N.Y.S.2d 437 (Civil Court Bronx County 1975).

 Here, the debtors allege that Aboff knowingly misappropriated and converted tax refund checks aggregating millions of dollars and a specific Macmillan wire transfer. In order to hold a defendant liable for conversion, there must be evidence that the defendant knowingly fostered the conversion or was aware of the conversion and declined to exercise his ability to set it right. *American Feeds & Livestock Co., Inc. v. Kalfco, Inc.*, 149 A.D.2d 836, 837, 540 N.Y.S.2d 354, 356 (3d Dep't 1989); *see also Bomar Resources, Inc. v. Sierra Rutile Ltd.*, No. Civ. 90 3773, 1991 WL 4544 (S.D.N.Y. Jan. 15, 1991). The plaintiff must show that the defendant exercised "unauthorized dominion" over the thing in question to the exclusion of the plaintiff's rights. *It's Entertainment v. Choice Entertainment, Inc.*, No. 90 Civ. 0653, 1991 WL 285615, * 10 (S.D.N.Y. Dec. 31, 1991); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384–85, 626 N.Y.S.2d

472, 475 (1st Dep't 1995); *Bomar Resources, Inc. v. Sierra Rutile Ltd.*, No. 90 Civ. 3773, 1991 WL 4544, *12 (S.D.N.Y. Jan. 15, 1991); *Bankers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 187 A.D.2d 384, 590 N.Y.S.2d 201 (1st Dep't 1992). Where the property is money, it must be specifically identifiable and subject to an obligation to be returned or to be otherwise treated in a particular manner. *Duvalier*, 211 A.D.2d at 384–85, 626 N.Y.S.2d at 475; *Key Bank*, — A.D.2d at —, 642 N.Y.S.2d at 404 (citations and quotations omitted); *It's Entertainment*, 1991 WL 285615, at *10.

Aboff was the president of PH(US)I and one of three signatories on PH(US)I's account into which were deposited the debtors' misappropriated tax refund checks. The day to day transfers of cash to and from various companies were conducted out of PH(US)I's West Putnam offices with its five person staff. *See* R. 1761–1765. PH(US)I's raison d'être was the transferring of funds the details of which were dictated by the Maxwells. In support of their claims, the debtors proffer certain PH(US)I deposit slips and certain Pergamon Holdings'[20] tax refund checks which were endorsed, "for deposit into the account of PH(US)I." R. 1785–88. The debtors also introduced into evidence a Macmillan wire transfer request form which indicated funds being transferred from Macmillan as well as PH(US)I bank statements which reflect transfers in and out of the account. However, the debtors were unable to link Aboff to the specific transactions upon which they are suing. Independent testimony established that Aboff's handwriting was not on the tax refund checks or the PH(US)I deposit slips associated with those transfers. In addition, Shaffer testified that Aboff could not wire transfer funds out of Macmillan. The few documents submitted by the debtors established merely that sums of money had been received by PH(US)I, but not their source or whether their receipt was improper. Whereas I may draw adverse inferences from several of Aboff's actions,[21] *Dow Chemi-*

---

**20.** Recall that Pergamon Holdings was a subsidiary of Macmillan.

**21.** Specifically, at his deposition, Aboff concealed his knowledge about another of PH(US)I's bank

accounts, R. 1767–1770, but the account was unrelated to the transactions at issue in the counterclaims. Aboff also destroyed nine bags of PH(US)I documents at a time when the indepen-

cal Co. v. S.S. Giovannella D'Amico, 297 F.Supp. 699 (S.D.N.Y.1969), I do not think those inferences rise to a level to permit me to conclude that Aboff exercised dominion over the funds in question.

The debtors also ask that I infer Aboff's knowledge that the transfers were wrongful. They reason that Aboff's denial of knowledge of wrongdoing ought not be believed. Aboff lied during these proceedings, shredded potential evidence, and manufactured his own. All these facts demonstrate that Aboff is capable of falsification to ensure his success on his own claims, and the destruction of documents suggests that Aboff might also be hiding something. Although one can postulate that Aboff may have had knowledge, the debtors have not given me evidence sufficient to draw that inference. Simply because Aboff was effectuating transfers as part and parcel of his responsibilities at PH(US)I does not prove knowledge of wrongdoing with respect to these transfers effected by someone else. Shaffer himself testified that he was aware of the intercompany borrowing. When the claim is based entirely on inference, the facts must give rise to a strong inference that the defendant had knowledge of or participated in the wrongdoing at the time of the alleged wrongdoing. See Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987) (pleading); see also Marine Midland Bank v. John E. Russo Produce Co., 65 A.D.2d 950, 950, 410 N.Y.S.2d 730, 732–33 (4th Dep't 1978) (permitting a strong negative inference to be drawn based upon the other evidence submitted); cf. Greene v. Blumberg (In re Longfellow Indus., Inc.), No. 86–5434, slip op. at 17 (Bankr.S.D.N.Y. Oct. 9, 1990) (the negative inference drawn from a defendant's assertion of his Fifth Amendment privilege alone is insufficient for a court to find in favor of the party against whom the privilege has been raised, "absent independent probative evidence of the facts alleged." (citing Baxter v. Palmigiano, 425 U.S. 308, 317–18, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); United States v. Bonanno Organized Crime Family of La Cosa Nostra, 683 F.Supp. 1411, 1451–52 (E.D.N.Y.1989), aff'd, 879 F.2d 20 (2d Cir.1989); In re Caucus Distributors, Inc., 106 B.R. 890, 921–22 (Bankr.E.D.Va.1989))). The fact that Aboff destroyed PH(US)I documents does not prove that Aboff made these transfers. Moreover, the debtors do not suggest that the documents which Aboff destroyed would have enabled them to fare better on any of the specific claims asserted here.

As to the debtors' fraud claim, it is elementary that fraud will not be presumed and must be proven. Lowendahl v. Baltimore & Ohio Railroad Co., 247 A.D. 144, 158, 287 N.Y.S. 62, 76 (1st Dep't), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936). This claim fails for much the same reason as the conversion claims, a failure of proof.

### E. Aboff's Request for Legal Fees

As a result of the highly suspect dealings between the public and private side companies, Aboff was investigated and sued. Aboff's proof of claim seeks damages of $362,194 for "refusal to provide and specific misrepresentations as to availability of directors' and officers' insurance coverage available to other directors, officers and employees" of the debtors in connection with investigation of business transactions of Macmillan and other Maxwell companies; claims against Aboff by Arthur Andersen & Co.; and in connection with the counterclaims which the debtors assert against him. During the trial, Aboff conceded that the claims for which he sought reimbursement were brought by private, not public, side companies for misappropriation of certain of their assets.

Aboff has the burden of proving the elements of the claim for insurance coverage. Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir.1995). He contends that he incurred substantial legal fees, approximately $350,000, defending and successfully clearing himself of the various charges. He submits several exhibits relating to Macmillan's officer and director liability insurance plan and says that Macmillan ought pick up the tab, because, at the very least, the debtors have conceded that he was a group vice president

dent auditors of MCC were seeking to examine them.

at Macmillan in 1989, and presumably some of the investigation related to his public side activities occurring during that time. *See* Ex. 175, 176. Aboff, however, offers no evidence beyond his recollection of what fees and expenses he incurred and nothing regarding what the services rendered covered. R. 1508–09, 1511–1516; *see Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 696–97 (2d Cir.1994) (claim under section 349 of New York General Business law properly dismissed where plaintiff failed to submit proof on element of claim). On cross-examination, the debtors demonstrated that Aboff's recollection is unreliable: some of the legal services were paid directly by PH(US)I and others did not even relate to matters supposedly covered, *see* Ex. XXX (examination of comparable state law regarding homestead exemptions in bankruptcy). Aboff's unsubstantiated recollection is insufficient to sustain his claim; he has too often tailored his testimony and destroyed or doctored evidence to permit me to rely on his word, assuming, without deciding, that his memory would otherwise be sufficient grounding for an award of fees. Moreover, Aboff has not adduced any proof as to any misrepresentation made to him about any insurance coverage.

*Conclusion*

Having failed to demonstrate that he had a contract with either Macmillan or OAG, Aboff is not entitled to payment from these debtors on his claims. Alternatively, Aboff's claims are disallowed because he intentionally tampered with critical evidence, causing substantial prejudice to the debtors. *See Computer Assocs. Int'l, Inc. v. American Fundware, Inc.,* 133 F.R.D. 166, 168–69 (D.Colo.1990). Aboff did not establish that he is entitled to reimbursement for his asserted legal fees.

The debtors originally raised Aboff's breach of fiduciary duty not only as a defense to liability but as a separate claim against Aboff arising primarily out of his failure to inform Macmillan that he possessed some of the missing Berlitz shares. Because these issues are before the state court and are not necessary to this decision (given my determi-

nation that neither Macmillan nor OAG are liable on the contract), I will not dwell any further on that issue.

The debtors have failed to meet their burden of proof on the counterclaims and are therefore not entitled to the damages they seek.

SETTLE ORDER consistent with this decision.